216 P.3d 421 (2009)
STATE of Washington, Respondent,
v.
Kenneth Miles HUNTER, Appellant.
No. 37110-3-II.
Court of Appeals of Washington, Division 2.
July 14, 2009.
Publication Ordered September 9, 2009.
*423 Catherine E. Glinski, Attorney at Law, Manchester, WA, for Appellant.
Michelle Luna-Green, Pierce County Prosecuting Attorney, Tacoma, WA, for Respondent.
VAN DEREN, C.J.
¶ 1 Kenneth Miles Hunter appeals his second degree murder conviction in the death of Ethel Jean Sergeant. He claims that the trial court erred in admitting evidence of a trigger pull device and requiring the jurors to use the device to demonstrate the alleged pull necessary to fire Hunter's gun. He also argues that the trial court erred in refusing to give Hunter's proposed jury instructions on the two lesser included offenses of manslaughter, first and second degree. We reverse and remand for further proceedings.

FACTS
¶ 2 On January 17, 2000, Hunter placed a telephone call to 911 from the Tacoma apartment he shared with Sergeant, stating that he was suicidal. Six City of Tacoma Police officers responded to the apartment and tried to make contact with the occupants but no one responded. The officers then obtained a key from the apartment manager and opened the apartment door. Officer Michael Field called into the apartment and Hunter answered, "I've got a gun in my mouth. I'm in the bathroom, and I have a gun in my mouth." V Report of Proceedings (RP) at 113. Hunter stated, "I killed my girlfriend," and "`It was an accident.'" V RP at 115. Field asked Hunter to throw his gun where they could see it and Hunter complied. Hunter then crawled out into the hallway where the officers could see him and the officers entered the apartment
¶ 3 The officers took Hunter into custody and searched the apartment. Hunter stated, "`My baby's in the bathtub,'" and told the officers that Sergeant had been shot "a day or two ago." V RP at 137. The officers found Sergeant's body in the bathtub. She had been shot in the head and had been dead for at least 24 hours.
¶ 4 On March 2, 2007, the State charged Hunter with second degree murder.[1] It also alleged that Hunter was armed with a firearm at the time of the murder and that the murder was a domestic violence offense.

TRIGGER PULL DEVICE
¶ 5 At trial, the State called Matthew Noedel, a former employee of the Washington State Patrol Crime Laboratory, who had created a trigger pull measuring device that he claimed demonstrated the feel of pulling the trigger on Hunter's gun. Hunter objected to the use of the trigger pull by the jury. The trial court allowed the State to make an offer of proof outside the presence of the jury to determine whether the device was sufficiently similar to the actual firearm used to kill Sergeant.
¶ 6 Noedel testified that he designed the device so that jurors could "understand what pressures and trigger pulls feel like" without requiring that the jurors handle actual firearms. He stated that the device "uses the actual types of weights that are used on the firearm, itself, to demonstratethis is how we measure pressure in the laboratory environment." VII RP at 363. The trigger pull *424 is made with a pulley system, which "has a limited effect on adding resistance to the system." The trigger pull has a "ring rather than an actual trigger, because it's easier to engineer that way" and it has added weight due to "other apparatus" necessary to the function of the trigger pull. VII RP at 362-64.
¶ 7 Noedel stated that "the friction is negligible" and that "[t]he only thing absent in this device [is that] in an actual firearm, you have a physical release of the hammer or of the firing pin mechanism, and that physical release, that snap of the firing pin going forward, doesn't occur here." VII RP at 365. Noedel demonstrated that the actual firearm used to kill Sergeant took seven and one half pounds of pressure to fire. He did this by hanging a seven pound weight from the trigger and then a one-half pound weight, with the trigger snapping only after adding the half pound weight.
¶ 8 On cross-examination, Noedel admitted that the best representation would be to use the actual gun. The ring on the trigger pull is narrower than the actual trigger, which affects the perceived pressure. Hunter asked Noedel to measure the distance from the trigger to the web of his hand on both devices; the distance on the trigger pull was one inch longer than on the actual gun. Noedel admitted that "the distance from the web of your hand to the trigger or the device affects perceived trigger pull." VII RP at 378. The actual size of a person's hand also affects the perceived trigger pull.
¶ 9 The prosecutor asked Noedel if controlling a juror's speed while pulling the trigger pull device would allow the jurors to "feel the pressure of the weight and the amount of force it takes to engage it rather than if you just squeeze" and Noedel answered affirmatively, stating:
To feel seven and a half pounds, I think the best way to use this device would be to just lift the weight a short distance and feel what that pressure looks like. Once you've lifted the weight, if you continue to pull it, now you are just working the weight, which is more work than what would discharge this firearm.
VII RP at 381-82.
¶ 10 The trial court tried the trigger pull at seven and one half pounds, at five pounds, and at two pounds. It also pulled the trigger on the actual firearm for comparison. The trial court then stated:
[T]he ultimate question is, is it helpful to the jury ... without being unduly prejudicial in some fashion. I think the legal test that has been described for generic demonstrations like this is, is the demonstration substantially similar to whatever it is that it's seeking to demonstrate or be compared to.
The narrow question is, what's it like to experience seven and a half pounds of trigger pull?.... [T]he demonstration is a pretty good representation of [that narrow question].[[2]]
VII RP at 393. In determining that the trigger pull was not unduly prejudicial, the trial court stated:
[I]t comes down to [whether] something [is] better than nothing....
....
... [I]t comes down to this kind of choice: If we don't do the demonstration, we are left to have the jury interpret this by words alone. If we do the demonstration, we have words and some experience with regard to what it's like to pull seven and a half pounds.
VII RP at 393-94. The trial court determined that Noedel would "indicate to the jurors how it will be most beneficial to feel the pull, by pulling slowly and not pulling too far" before they tried using the trigger pull. VII RP at 397.
¶ 11 In the presence of the jury, Noedel testified that "the amount of pressure or the amount of weight it took to cause this gun to discharge was seven and a half pounds." VII RP at 446. Noedel described the trigger pull device and how it simulates the pulling of the trigger on the actual gun. He explained that *425 the jurors should "pull slowly and pull just... until the weight moves." VII RP at 448. The prosecutor then asked the court to allow the jurors to "step down to the trigger-pull device and engage that, suggesting to them that they are not to ask questions or to speak, but just to step down, do it once, and then return to their seats." VII RP at 449. The trial court instructed the jurors to participate, calling one row of jurors at a time. See VII RP at 449-50.
¶ 12 During cross examination, Noedel admitted that "[t]here are some significant differences between [his] device and the actual firearm." VII RP at 450. He stated that "[t]he physical dimensions of th[e] reach are different by about one inch" and that this would "affect perceived trigger pull." In addition, the trigger of the "[t]he actual firearm has a wider surface than [the trigger pull] ring represents," which "affects perceived trigger pull." VII RP at 450-51. On the trigger pull device, the ring pulls straight back, whereas the actual trigger "rotates or swings like a lever ... so [it] has a different feel than pulling the straight ring." Because it is a lever, the actual gun "takes a different amount of pressure at the top of the trigger... than it does at the bottom of the trigger." The gun has a "gradual increase in pressure." VII RP at 452-53.

JURY INSTRUCTIONS
¶ 13 Hunter testified that he "really d[id]n't know" what happened the day he shot Sergeant. VII RP at 506. He did not recall "wiping down the bathroom or cleaning up the bathroom" after the shooting. He did not recall "putting Ms. Serge[a]nt's body into the bathtub" or "closing the shower curtain." VII RP at 506. He did not recall shooting Sergeant. He testified that he purchased the gun in late 1995 or early 1996 to prepare "to try to do some competition shooting." VII RP at 496.
¶ 14 On cross examination, the following interaction took place:
[State:] You shot Ms. Serge[a]nt.
[Hunter:] I shot her.
[State:] In the face?
[Hunter:] Wasn't intentional.
[State:] In the face?
[Hunter:] It wasn't intentional.
[State:] Did you shoot Ms. Serge[a]nt in the face, Mr. Hunter?
[Hunter:] If that's where it landed, yes, you know, Ilet's say this: An accident occurred.
[State:] Mr. Hunter, did you shoot Ms. Serge[a]nt in the face?
[Hunter:] Yes, I did.
VII RP at 510. Hunter did not recall how close he was to Sergeant at the time of the shooting. The State then asked about Hunter's experience with guns:
[State:] You went through basic training in the Army?
[Hunter:] Yes, I did.
[State:] Firearms?
[Hunter:] Yes.
[State:] Shot things?
[Hunter:] Yes.
[State:] Shot to kill? Sorry, trained to shoot to kill?
[Hunter:] Yes.
[State:] Trained to hit what you shoot at?
[Hunter:] Yes.
[State:] Good shot?
[Hunter:] Yes.
....
[State:] And you were a good enough shot that you were going to take up competition shooting?
[Hunter:] Yes, I was planning on it.
....
[State:] [Y]ou knew how to keep guns safe, right, Mr. Hunter?
[Hunter:] Yes.
....
[State:] You are familiar enough with your own gun that you know when the safety is on and when the safety is off, right?
[Hunter:] Yes.
VII RP at 512-15. Hunter stated:
I do recall taking the briefcase, the .45, and everything in the bathroom with me, and we was [sic] discussing something. If you ask me what we were discussing, I can't begin to tell you[.] The magazine *426 was not in [the gun] at the time, and to my knowledge, I did not have a round in the chamber. I'm not saying thatwith the circumstances, it could have been. I could have had it all fully engaged.
VII RP at 523. Hunter finally stated, "I really don't even remember pulling the trigger, if the trigger was pulled." VII RP at 538.
¶ 15 Hunter submitted proposed jury instructions including the two lesser included offenses of first and second degree manslaughter. The prosecutor conceded that first and second degree manslaughter were lesser included offenses of second degree murder but argued that there was a "lack of a factual basis for giving those lesser includeds." VIII RP at 550.
¶ 16 The trial court declined to give the lesser included offense instructions but offered to give an instruction on excusable homicide.[3] It determined that there were insufficient facts to find Hunter guilty of manslaughter to the exclusion of murder, as required by State v. Fernandez-Medina, 141 Wash.2d 448, 6 P.3d 1150 (2000). The trial court reasoned that, because Hunter alternately stated that it was an accident and that he did not remember,
one comes away with the conclusion that either there's no evidence there that supports any inference one way or another that's the `I don't remember' partor that it was an accident, and that supports the excusable homicide analysis.
....
... I don't see what you pull out of the State's evidence that ... points to either Manslaughter in the First Degree or Manslaughter in the Second Degree to the exclusion of intentional homicide.
What's left is either there was intent or there wasn't intent. If there was intent, the State prevails with Murder in the Second Degree. If there wasn't intent, then excusable homicide is the result.
VIII RP at 554-55.
¶ 17 Hunter's counsel later asked that the excusable homicide instructions be removed from the jury instructions, stating, "With those in there ... I find myself in the position that I can't argue ... the defense's theory of the case." VIII RP at 556. The trial court granted Hunter's request and removed the excusable homicide instructions from the final jury instructions.
¶ 18 The jury convicted Hunter of second degree murder. The jury also found that Hunter was "armed with a firearm at the time of the commission of the crime" and that the crime was "an incident of domestic violence" in two special verdict forms. Hunter appeals.

ANALYSIS

I. DEMONSTRATIVE EVIDENCE
¶ 19 Hunter argues that the trial court abused its discretion in allowing the use of the trigger pull device during Noedel's testimony. He argues that the trigger pull was not sufficiently similar to the actual firearm and, therefore, its use was more prejudicial than probative. The State argues that "[t]he trial court has broad discretion to decide whether to permit demonstrations." Br. of Resp't at 20. It argues that "the model accurately illustrated the fact sought to be proved: the mechanics of trigger pull and how much weight is involved in the trigger pull of the weapon in this case." Br. of Resp't at 22.

A. Standard of Review
¶ 20 We review a trial court's admission of demonstrative evidence for an abuse of discretion. Jenkins v. Snohomish County Pub. Util. Dist. No. 1, 105 Wash.2d 99, 107, 713 P.2d 79 (1986). Parties may use demonstrative evidence "if it accurately illustrates facts sought to be proved." "The conditions of the experiment must be substantially similar to those of the event at issue, but any dissimilarity goes to the weight of the evidence, to be evaluated by the jury." Jenkins, 105 Wash.2d at 107, 713 P.2d 79. Further, the demonstration must be relevant. To be relevant, the evidence must be material *427 and probative. "`The ultimate test for the admissibility of an experiment as evidence is whether it tends to enlighten the jury and to enable them more intelligently to consider the issue presented.'" Jenkins, 105 Wash.2d at 107, 713 P.2d 79 (quoting Sewell v. MacRae, 52 Wash.2d 103, 107, 323 P.2d 236 (1958)).

B. Demonstrative Device Not Accurate Representation
¶ 21 Noedel testified that the trigger pull was "a reasonable representation of what a given amount of trigger pressure feels like." VII RP at 364. He testified that "[t]here are obviously limits to this design... but it's the closest thing that I've ever come up with that simulates what we actually do in the laboratory to define what trigger pull pressure is." VII RP at 362.
¶ 22 But Noedel also testified to substantial differences between the trigger pull device and the firearm used to kill Sergeant. He testified that "[t]here are some significant differences between [his] device and the actual firearm." VII RP at 450. The "physical dimensions of th[e] reach are different by about one inch," the trigger of "[t]he actual firearm has a wider surface that [the trigger pull] ring represents," and the trigger pull device pulls straight back unlike the lever system on an actual trigger. Noedel admitted that all of these factors affected the "perceived trigger pull." VII RP at 450-51. Further, Noedel testified that a real firearm starts at zero and adds more pressure as a person pulls the trigger, while the trigger pull device has a steady weight of seven and one half pounds.
¶ 23 The trial court admitted the evidence to show "what[] it [is] like to experience seven and a half pounds of trigger pull." VII RP at 393. But Noedel admitted on cross-examination that the differences between the trigger pull device and the actual firearm affected the "perceived trigger pull." VII RP at 450-52. Therefore, the trial court abused its discretion in determining that the evidence was sufficiently similar to the "facts sought to be proved." Jenkins, 105 Wash.2d at 107, 713 P.2d 79.
¶ 24 Furthermore, this evidence was not harmless. "Improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the evidence as a whole." State v. Neal, 144 Wash.2d 600, 611, 30 P.3d 1255 (2001). Hunter maintained that he accidentally shot Sergeant. The trigger pull device gave the jurors an improper understanding of the amount of pressure needed to pull the trigger on Hunter's firearm, undermining Hunter's theory that he accidentally pulled the trigger.
¶ 25 Because the trigger pull device was not substantially similar to the firearm used to shoot Sergeant, we hold that the trial court abused its discretion in admitting Noedel's demonstrative device.

II. JURY INSTRUCTION
¶ 26 Hunter also argues that the trial court's refusal to include instructions on the lesser included offenses "denied [him] his right to present a defense." Br. of Appellant at 7 (emphasis omitted). He argues that
[b]ecause evidence established that Hunter was familiar with the gun, he knew how to handle it safely, and he did not intend to shoot Sergeant, the jury could reasonably infer that he was handling the gun recklessly or negligently when the gun went off.... Thus, the evidence supports the inference that only the lesser crimes were committed to the exclusion of the greater offense.
Br. of Appellant at 10.
¶ 27 The State argues that "the facts of the case did not establish that a reckless or negligent act occurred at [the] exclusion of an intentional act. While [Hunter] claimed that it was an `accident' there was nothing in the record to support that the discharge of the gun was accidental." Br. of Resp't at 15.

A. Standard of Review
¶ 28 We review the adequacy of jury instructions based on an error of law de novo. State v. Clausing, 147 Wash.2d 620, 626-27, 56 P.3d 550 (2002). But where, as here, the trial court refuses to give an instruction based on the facts of the case, we review the *428 refusal for an abuse of discretion. State v. Lucky, 128 Wash.2d 727, 731, 912 P.2d 483 (1996), overruled on other grounds by State v. Berlin, 133 Wash.2d 541, 547-49, 947 P.2d 700 (1997).

B. Lesser Included Jury Instructions
¶ 29 In Washington,
a defendant is entitled to an instruction on a lesser included offense if two conditions are met. First, each of the elements of the lesser offense must be a necessary element of the offense charged. Second, the evidence in the case must support an inference that the lesser crime was committed.
State v. Workman, 90 Wash.2d 443, 447-48, 584 P.2d 382 (1978). The parties concede that the first prong has been met. We must, therefore, determine whether a rational jury could have found Hunter guilty of the lesser offenses based on the evidence presented.
¶ 30 "The purpose of [the second prong] is to ensure that there is evidence to support the giving of the requested instruction." This factual showing must be "more particularized than that required for other jury instructions" and "must raise an inference that only the lesser included ... offense was committed to the exclusion of the charged offense." Fernandez-Medina, 141 Wash.2d at 455, 6 P.3d 1150. "If the evidence would permit a jury to rationally find a defendant guilty of the lesser offense and acquit him of the greater, a lesser included offense instruction should be given." State v. Warden, 133 Wash.2d 559, 563, 947 P.2d 708 (1997). This rule is intended to allow both parties to "have jury instructions embodying its theory of the case" but only "if there is evidence to support that theory. It is error to give an instruction not supported by the evidence." Warden, 133 Wash.2d at 563, 947 P.2d 708.
¶ 31 We must "view the supporting evidence in the light most favorable to the party that requested the instruction." But "the evidence must affirmatively establish the defendant's theory of the caseit is not enough that the jury might disbelieve the evidence pointing to guilt." Fernandez-Medina, 141 Wash.2d at 455-56, 6 P.3d 1150.
¶ 32 In Fernandez-Medina, the defendant entered an apartment where his ex-girlfriend was visiting friends, Wayne Butler and Dorothy Perkins, and he began shooting a handgun. After shooting and severely injuring Butler, Fernandez-Medina aimed the handgun at Perkins's head. Perkins testified that she "closed her eyes and then heard `[a] clicking sound.'" Fernandez-Medina, 141 Wash.2d at 451, 6 P.3d 1150 (quoting Fernandez-Medina Clerk's Papers (CP) at 411).
¶ 33 The State charged Fernandez-Medina with "two counts of attempted first degree murder and, alternatively, with two counts of first degree assault." Fernandez-Medina, 141 Wash.2d at 451, 6 P.3d 1150. He argued at trial that he was not present at the shooting and argued an alibi defense. He also "presented testimony of an expert witness who indicated that various noises can emanate from the type of handgun allegedly used... even when the trigger is not pulled." Fernandez-Medina, 141 Wash.2d at 451, 6 P.3d 1150. "The State's forensic expert also testified that such a handgun can make various `clicks,' even when the trigger is not pulled." Fernandez-Medina, 141 Wash.2d at 452, 6 P.3d 1150 (quoting Fernandez-Medina CP at 411).
¶ 34 At the close of his case, Fernandez-Medina requested a jury instruction for second degree assault. The trial court declined to give the instruction and the court of appeals affirmed. Fernandez-Medina, 141 Wash.2d at 452, 6 P.3d 1150.
¶ 35 The Washington Supreme Court reversed, holding that, "[v]iewing the testimony of both experts most favorably to Fernandez-Medina, we are satisfied that it raised an inference that the `clicking sound' Perkins claimed she heard was not caused by Fernandez-Medina pulling the trigger as he pointed the gun at her." Further, the court held that "[i]f the requested instruction had been given, the jury might reasonably have inferred from all of the evidence that Fernandez-Medina did not intend to do great bodily injury to Perkins." The court noted that "[i]f the trial court was to examine only the testimony of the defendant, it would have been justified in refusing to give the requested inferior degree instruction," since Fernandez-Medina *429 claimed he was not present at the time of the shooting. But "[a] trial court is not to take such a limited view of the evidence [and] must consider all of the evidence that is presented at trial when it is deciding whether or not an instruction should be given." Fernandez-Medina, 141 Wash.2d at 456-57, 6 P.3d 1150.
¶ 36 Here, Hunter requested jury instructions on first and second degree manslaughter. The proposed instruction on first degree manslaughter stated, "A person commits the crime of manslaughter in the first degree when he or she recklessly causes the death of another person." CP at 73. The proposed instruction on second degree manslaughter stated, "A person commits the crime of manslaughter in the second degree when, with criminal negligence, he or she causes the death of another person." CP at 75. Hunter's proposed instructions also included definitions of recklessness[4] and criminal negligence.[5] The trial court declined to include Hunter's proposed instructions, stating that "there's no scenario presented from either the defense or parts of the State's evidence that supports reckless or negligent conduct." VIII RP at 555.
¶ 37 Hunter testified that he did not remember shooting Sergeant. But he also testified that he shot her and that the shooting was an accident. He testified that he loved Sergeant. He also stated that he was suicidal following the shooting and that he wrote out Sergeant's next of kin's contact information for the police. Hunter remembered the gun being in the safety position when he took it into the bathroom before the shooting. He also testified that he was an experienced shooter and that he knew how to keep a gun safe.[6] In addition to Hunter's testimony, Field testified that Hunter told the police that the shooting was an accident.
¶ 38 The trial court relied on State v. Hernandez, 99 Wash.App. 312, 997 P.2d 923 (1999) in declining to give Hunter's proposed lesser included instructions. In Hernandez, Hernandez called 911 and stated that his girlfriend, Robin Valadez, had been shot in the chest. He first insisted that he was not present at the time of the shooting but then stated that "the shooting had been an accident." In a recorded statement, Hernandez explained that he heard Valadez shoot the gun in the dining room and he "immediately got up. [He] went towards [Valadez] to grab the gun and she went into the kitchen. [He] grabbed the gun. She fell down. She hit the floor." Hernandez then stated, "I could have grabbed [the gun] though ... I don't know." Hernandez, 99 Wash.App. at 315-16, 997 P.2d 923.
¶ 39 Division One of our court stated that Hernandez "did not specifically describe any physical acts that explain how Valadez was shot. He did not establish that he touched the gun before the bullet that killed Valadez was fired." Because the lesser included offenses of first and second degree manslaughter "require a finding that the accused actually caused the death of another," the court found that Hernandez had not established "affirmative evidence that he committed first or second degree manslaughter and not second degree murder." Hernandez, 99 Wash. App. at 320, 997 P.2d 923. Here, Hunter admitted shooting Sergeant but argued that the shooting was an accident. Therefore, this case can be distinguished from Hernandez in that Hunter can establish the elements of first and second degree manslaughter.
¶ 40 Hunter's testimony that the shooting was an accident raised the inference that Hunter was guilty only of manslaughter and *430 not murder. Without the lesser included offense instruction, Hunter could not adequately argue his theory of the case. Refusal to give the lesser included instructions allowed the jury to disregard Hunter's testimony that the shooting was an accident. Furthermore, without the instruction, the jury's only alternative to the second degree murder conviction was a not guilty verdict, a difficult or impossible verdict in light of Hunter's admission that he shot Sergeant in the face, which shot resulted in her death. VII RP at 510. Had the lesser included instructions been given, the jury could have reasonably inferred from all the evidence that Hunter did not intend to kill Sergeant. Fernandez-Medina, 141 Wash.2d at 456-57, 6 P.3d 1150. Therefore, the trial court abused its discretion in refusing to give the lesser included offense instructions.
¶ 41 Because Hunter met both Workman requirements, we hold that the trial court abused its discretion in refusing to include instructions on the lesser included offenses of first and second degree manslaughter.
¶ 42 We reverse Hunter's conviction and remand for a new trial.
We concur: QUINN-BRINTNALL and PENOYAR, JJ.
NOTES
[1] Hunter was originally charged on January 20, 2000, with second degree murder or, alternatively, second degree felony murder. Hunter pleaded guilty to felony murder but the conviction was reversed following two Washington Supreme Court cases, In re Pers. Restraint of Andress, 147 Wash.2d 602, 56 P.3d 981 (2002) and In re Pers. Restraint of Hinton, 152 Wash.2d 853, 100 P.3d 801 (2004).
[2] The trial court noted that "[i]f you look at it in the broader vein of, is this an accurate representation of what it's like to experience the complete pulling of the trigger of the weapon, then there's obviously more difference." VII RP (Nov. 7, 2007) at 393.
[3] "Homicide is excusable when committed by accident or misfortune in doing any lawful act by lawful means, without criminal negligence, or without any unlawful intent." RCW 9A.16.030.
[4] "A person is reckless or acts recklessly when he or she knows of and disregards a substantial risk that a wrongful act may occur and the disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation." CP at 77.
[5] "A person is criminally negligent or acts with criminal negligence when he or she fails to be aware of a substantial risk that a wrongful act may occur and the failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation." CP at 78.
[6] Hunter insisted he knew how to keep the gun in the safety position but became confused during cross examination when shown the gun and asked whether it was currently in the safety position.