IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 74334-1-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| HANS ERIC HANSEN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: May 22, 2017 |
| | ) | |

BECKER, J. — This is Hans Hansen's appeal from convictions for assault and drive-by shooting. We find no abuse of discretion by the trial court in allowing the State to present a demonstrative video of ammunition piercing a bulletproof vest and a car door. The demonstration was relevant to show Hansen's intent to harm the police officers he shot at and to rebut his defense that he was only trying to get himself killed. We also conclude the court properly forfeited the arsenal of firearms Hansen had in his truck during the incident.

## FACTS

Hansen, a 43-year-old man with no criminal history to speak of, went on a shooting spree with an AK-47 in Snohomish County one evening in October 2014. At the time, Hansen was troubled by setbacks in his personal life. He told arresting officers that he was losing his company, his leg was going to be

amputated, his house was about to go into foreclosure, he was an alcoholic, and his son was suicidal. Hansen told the officers he was "done with life."

Hansen drove to an industrial park in Granite Falls. From his truck, he repeatedly shot his AK-47 at the building where he had previously run a cabinet-making business. He proceeded to the Granite Falls Police Department and the Lake Stevens Police Department. He repeatedly shot at police cars parked at both stations.

He then drove into Marysville. According to the officers' testimony, Hansen shot at numerous officers and police cars as they pursued him. Some of them testified that they perceived from the path of his bullets that he was tracking their movements. Officers dodged his shots and took refuge behind their vehicles. One officer was struck several times in the leg and sustained serious injuries.

Eventually, the officers set spike strips in the road and one officer shot at Hansen's truck as it approached. The truck came to a stop, and Hansen got out. He was arrested and taken to the hospital, where it was discovered that despite an abundance of blood, he had sustained only a superficial head wound. The police interviewed Hansen at the hospital.

The State charged Hansen with two counts of attempted first degree murder, five counts of first degree assault, and four counts of drive-by shooting. The State alleged firearm enhancements on the attempted murder and assault charges.

2

Trial lasted for approximately 11 days in October and November 2015. Hansen did not testify. His defense presented an expert witness on mental illness to support a diminished capacity defense.

A disputed issue at trial was Hansen's intent as it related to the attempted murder and assault charges. Both parties drew inferences from the interview of Hansen conducted by the police at the hospital. The State theorized that Hansen picked the police as targets for his anger because his house was in foreclosure and he believed the police were going to kick him out of his house. Therefore, the State argued, "he was going to hunt for the people that he was mad at." Hansen claimed he did not have the intent required for the attempted murder and assault charges. He defended on the theory that he was suicidal: he wanted to provoke the officers to shoot him and kill him and "his intent that night was not to harm anyone but himself."

The jury deadlocked on the attempted murder charges; the court declared a mistrial as to those charges and later dismissed them. The jury convicted Hansen of four counts of first degree assault, one lesser-included count of second degree assault, two counts of drive by shooting, and two lesser-included counts of unlawful discharge of a firearm. The jury found firearm enhancements on all of the assault convictions.

The court rejected Hansen's request for an exceptional sentence downward. Hansen was sentenced to 861 months, the top of the standard range. The court ordered forfeiture to the sheriff's office of the firearms and ammunition found in Hansen's truck at the time of his arrest.

3

Hansen appeals the convictions for first degree assault and drive-by shooting, the sentence, and the forfeiture order.

## DEMONSTRATIVE VIDEO

At trial, the State showed the jury a demonstrative video created by the crime laboratory of the Washington State Patrol. The video is less than three minutes long. It shows the State's firearms expert, Brian Smelser, shooting Hansen's AK-47 using steel-jacketed ammunition that was found in Hansen's truck. First, Smelser shoots two rounds at a car door mounted on a wooden block about 25 feet away; both rounds pierce the door. Next, from the same distance, he takes one shot at a bulletproof police vest mounted over a plastic jug of water; the shot penetrates through the vest and water pours out of the plastic jug. The last segment of the video is a close-up showing Smelser shooting the AK-47, slower at first and then faster.

Hansen argues that the demonstrative video did not meet the test for admissibility of demonstrative evidence, and as a result, his convictions for first degree assault and drive-by shooting should be reversed.

This court reviews a trial court's decision to admit evidence under an abuse of discretion standard. State v. Finch, 137 Wn.2d 792, 810, 975 P.2d 967, cert. denied, 528 U.S. 922 (1999). When a trial court's exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons, an abuse of discretion exists. Finch, 137 Wn.2d at 810.

The use of demonstrative evidence is encouraged when it accurately illustrates facts sought to be proved. Finch, 137 Wn.2d at 816. In Finch, the

defendant fired shots from a bedroom window when police arrived to conduct an investigation of a report of a murder. What could be seen from the bedroom window was relevant to questions of intent and premeditation. Finch, 137 Wn.2d at 818. The court affirmed the admission of a video demonstrating the foliage and lighting conditions at the scene as they affected the visibility of police movements as seen from the window.

"'The ultimate test for the admissibility of an experiment as evidence is whether it tends to enlighten the jury and to enable them more intelligently to consider the issues presented.'" Finch, 137 Wn.2d at 816 (internal quotation marks omitted), quoting Jenkins v. Snohomish County Pub. Util. Dist. No. 1., 105 Wn.2d 99, 107, 713 P.2d 79 (1986). The factors that determine whether demonstrative evidence is admissible are set forth in Finch, 137 Wn.2d at 816.

Relevance

The evidence sought to be admitted must be relevant. Finch, 137 Wn.2d at 816. The point of the demonstrative video was to ensure the jury understood that a police officer is not necessarily shielded from harm by wearing a ballistics vest or crouching behind the door of a police car. The State argued to the trial court, and maintains on appeal, that the demonstrative video was relevant to prove Hansen intended to harm the officers he was shooting at. For attempted first degree murder, the State had to prove that Hansen had a "premeditated intent to cause the death of another person." RCW 9A.32.030(1)(a). For first degree assault, the State had to prove that Hansen had the "intent to inflict great bodily harm." RCW 9A.36.011(1).

5

The evidence suggested that Hansen was very familiar with the power of an AK-47. He and his wife had often visited shooting ranges. He told the detectives at the hospital that the steel-tipped bullets he fired from his AK-47 could penetrate cars and bulletproof vests. Thus, he argues that his understanding of the penetrating power of the AK-47 was undisputed and the State did not need the video to prove it.

The State was not required to rely on Hansen's admission to prove he knew an AK-47 could penetrate a car door or a ballistics vest. The State was entitled to rebut Hansen's defense that he did not intend to harm the officers. During the interview, Hansen said he went on a "joyride with an AK-47" because he was "done with life." He said he planned to "just piss off as many fucking people as I could 'til I got shot." He said he tried to shoot police cars, not officers, and he was "not happy" to hear that he hit an officer because "I never honestly had any intention of hurting anybody." The jury could infer from the demonstrative video that Hansen, given his familiarity with the AK-47, knew full well that shooting such a powerful weapon at police cars could kill human beings who were taking cover inside or behind them. The video was relevant to prove that despite his disavowal of lethal intent, Hansen did intend to inflict great bodily harm or death when he shot at the police officers and their cars.

Substantially similar conditions

Demonstrative evidence is admissible if the experiment was conducted under substantially similar conditions as the event at issue. Finch, 137 Wn.2d at 816. Determining whether the similarity is sufficient is within the trial court's

6

discretion, and the decision will not be disturbed on appeal absent an abuse of discretion. Finch, 137 Wn.2d at 816. If the similarity is sufficient to justify admission, any lack of similarity goes to the weight of the evidence. Finch, 137 Wn.2d at 816.

Hansen contends the demonstration of a bullet piercing a ballistics vest should have been excluded because there is no allegation that any of his bullets hit the officers' ballistics vests. But the demonstration in the video was not intended to recreate the crime scene. It was offered to prove Hansen's intent, not what actually occurred. Any lack of similarity between the ballistics vest in the video and vests worn by the officers Hansen shot at went to the weight of the evidence, not admissibility. See Finch, 137 Wn.2d at 816.

Hanson also argues that the demonstration was not substantially similar because it shows Smelser sighting with and carefully aiming the AK-47, whereas according to Hansen, the evidence shows that he did not aim at the officers but rather shot recklessly in the general direction of their vehicles. His description of the demonstration is inaccurate, in that the video does not show Smelser aiming at any target, the trajectory of any bullet, or any bullet hitting a target. It is a close-up of Smelser shooting the gun. The video does not disprove either Hansen's statement that he did not aim at individual officers or the officers' testimony that his shots appeared to track their movements.

Hansen contends the 25-foot distances to the targets in the video were not similar to the actual distances between him and his targets. As the State explained to the trial court, the distance was approximate because Hansen fired

7

various shots at different distances. Hansen does not claim that 25 feet is inaccurate or an unreasonable estimation. The estimate was sufficiently similar to justify admission, and any lack of similarity went to the weight of the evidence.

Hansen argues that his case is like State v. Hunter, 152 Wn. App. 30, 216 P.3d 421 (2009), review denied, 168 Wn.2d 1008 (2010). In Hunter, the key issue was whether the defendant, on trial for murder, intended to shoot the victim or whether the gun in his hands went off by accident. A demonstrative "trigger pull device" was admitted to show jurors what it was like to experience trigger pull and thus to prove that considerable pressure was needed to fire the gun in question. Hunter, 152 Wn. App. at 42. The conviction was reversed on appeal because the demonstration did not meet the requirement for substantially similar conditions. Hunter, 152 Wn. App. at 42. The defense was able to show through cross-examination of the State's expert witness that the perceived trigger pull created by the device was substantially different from the trigger pull required for the gun used by the defendant. Hunter, 152 Wn. App. at 42. In this case, the demonstration in the video was similar to Hansen's conduct. Smelser used the same gun and the same bullets as Hansen.

Prejudice

If the evidence is more prejudicial than probative, the court should refuse its admission. Finch, 137 Wn.2d at 816. Hansen argues that the video was prejudicial because it was "frightening," provoked "raw emotion," and "focused the jurors on their understandable fear of the inherent dangerousness to persons and police of the weapons involved." This is not an accurate assessment of the

emotional effect of the video. The video is not a re-creation of the crime. The car door is not attached to a car. The ballistics vest has a plastic jug of water inside, not a human effigy. The targets are removed from context and seen as disembodied objects. While the observer gets the message that the water pouring out of the pierced plastic jug is supposed to represent blood, the visual representation is rather sterile, much like a technical description in an instructional manual.

The court may consider whether demonstrative evidence is "merely cumulative and illustrative of issues already introduced and therefore not prejudicial or whether it is unique evidence of a factual assertion and potentially prejudicial." Jenkins, 105 Wn.2d at 107. Here, the video was not unique evidence; the potential prejudice of the video was diminished by the fact that it illustrated issues already introduced.

By the same standard, Hansen argues that the video should have been excluded because it was cumulative of other evidence, including testimony and photographs showing that Hansen's bullets did penetrate through the police cars he fired at, and therefore it did not add to the jury's ability to answer the disputed issue of intent.

In admitting the video, the trial court found that the visual dimension of the video made it useful to the jury in a way that the other evidence did not project: "I don't think a general juror really understands the power of this particular gun that was used in terms of the power of an AK-47 and I do think the video does show that in a way that is different than just describing things in testimony."

9

We conclude the trial court properly determined the demonstrative video was relevant and that it met the requirement for substantially similar conditions. Any potential prejudice was not so great as to require its exclusion. Though somewhat cumulative of other evidence, the video satisfied the ultimate test of admissibility: it tended to enlighten the jury and to enable them to more intelligently consider the issues presented. We find no abuse of discretion in admitting the video.

## REQUEST FOR MITIGATED SENTENCE

The standard range sentence generated by the number of convictions for this incident was high.[1] The court imposed a sentence of 861 months, the top of the standard range. Hansen proposed a sentence of 516 months, an exceptional sentence below the standard range. He appeals the trial court's decision denying that request.

A sentencing court may depart from the sentencing guidelines and impose an exceptional sentence below the standard range if it finds that mitigating circumstances are established by a preponderance of the evidence. RCW 9.94A.535(1). One mitigating factor recognized by the statute as appropriate for consideration by the court is whether "the defendant's capacity to appreciate the wrongfulness of his or her conduct, or to conform his or her

---

[1] Hansen's offender scores, which were 0, 6, and 12 for the various convictions, included only his current offenses. The convictions for first degree assault were serious violent convictions that must run consecutively. The court imposed the top of the standard range for each of these first degree assault convictions, 585 months total, plus the required firearm enhancements of 276 months, for a total sentence of 861 months. The sentences for the other convictions ran concurrently.

conduct to the requirements of the law, was significantly impaired. Voluntary use of drugs or alcohol is excluded." RCW 9.94A.535(1)(e). Hansen's request was based on this statutory provision and the testimony of expert witness Mark Koenen, a psychiatrist, who diagnosed Hansen with alcohol dependence, depression, and anxiety. Dr. Koenen explained that alcohol use, health problems, financial problems, and marital problems are all exacerbating factors for depression.

The court declined to depart from the standard range:

> I accept that Mr. Hansen on that evening was a man with serious and debilitating physical and mental health issues which clearly devolved into a mental health crisis which was supplemented clearly by alcohol abuse as well. It was a potent and lethal combination, but I do not accept that that stands as a reason to somehow hold Mr. Hansen less accountable when I look at his actions. This was not, these were not events that happened in the blink of an eye or an instant. They were clearly planned over a significant period of time. They took place over a significant period of time.
>
> . . . .
>
> I cannot and do not accept that Mr. Hansen's difficulties in any way excused his actions on that night. The actions were simply too egregious.
>
> . . . .
>
> There are, unfortunately, a lot of people in our community who suffer from physical and mental health issues. Our mental health system is clearly far from perfect, but it does exist and it exists to help those who are willing to seek help.
>
> Mr. Hansen did not seek that help and instead his actions were about as far removed from seeking help as a person can get. They were actions that forced trauma on a great many people and, again, in my opinion, they are actions that deserve maximum accountability.
>
> So I will not accept the defense recommendation. I don't believe there are any factors that would justify an exceptional sentence down.

A standard range sentence is generally not appealable. RCW 9.94A.585(1). When a defendant's request for an exceptional sentence below the standard range has been denied, our "review is limited to circumstances where the court has refused to exercise discretion at all or has relied on an impermissible basis for refusing to impose an exceptional sentence below the standard range." State v. Garcia-Martinez, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997), review denied, 136 Wn.2d 1002 (1998).

Hansen contends the court relied on an impermissible basis to refuse his request for an exceptional sentence. In his view, the court refused to consider whether he had a mental illness that diminished his capacity to appreciate that his conduct was wrongful or to conform his conduct to the requirements of the law.

A trial court that has considered the facts and has concluded that there is no basis for an exceptional sentence has exercised its discretion, and the defendant may not appeal that ruling. Garcia-Martinez, 88 Wn. App. at 330. That is the case here. The ruling reflects the court's awareness that Hansen suffered from mental illness. The fact of mental illness, particularly when coupled by alcohol abuse, is not enough by itself to compel a downward departure from the guidelines. Indeed, "impaired judgment and irrational thinking is inherent in most crimes." State v. Rogers, 112 Wn.2d 180, 185, 770 P.2d 180 (1989). What the court's ruling reflects is not a refusal to consider the proposed mitigating factor. Rather, it reflects that the court did not see the evidence as sufficient to

establish the mitigating factor. The court exercised its discretion, and Hansen may not appeal the length of the sentence.

FIREARMS FORFEITURE

The court ordered forfeiture of the firearms and ammunition found in and around Hansen's truck at the time he was arrested. Hansen assigns error to the order of forfeiture.

A court may order forfeiture of a firearm that is proven to be "in the possession or under the control of a person at the time the person committed or was arrested for committing a felony or committing a nonfelony crime in which a firearm was used or displayed." RCW 9.41.098(1)(d).

Hansen first argues that the court must return the firearms to his wife because she is an owner of the firearms who had no knowledge of nor consented to his crimes. "The court shall order the firearm returned to the owner upon a showing that there is no probable cause to believe a violation of subsection (1) of this section existed or the firearm was stolen from the owner or the owner neither had knowledge of nor consented to the act or omission involving the firearm which resulted in its forfeiture." RCW 9.41.098(3).

Hansen cannot assert a claim to the firearms on behalf of his wife in this appeal. His wife was not a party before the trial court and is not a party on appeal. She is not represented by Hansen's attorney, and her interests are not at issue here.

Hansen next argues that the trial court erred in ordering the forfeiture of two upper receivers and six magazines with ammunition because they are not "firearms" within the meaning of the statute.

Whether an object is a "firearm" within the meaning of the statute is a question of statutory interpretation that we review de novo. State v. Raleigh, 157 Wn. App. 728, 734, 238 P.3d 1211 (2010), review denied, 170 Wn.2d 1029 (2011).

"Firearm" means "a weapon or device from which a projectile or projectiles may be fired by an explosive such as gunpowder." RCW 9.41.010(9). A disassembled firearm that can be rendered operational with reasonable effort and within a reasonable time period is a firearm within the meaning of the statute. State v. Padilla, 95 Wn. App. 531, 535, 978 P.2d 1113, review denied, 139 Wn.2d 1003 (1999); State v. Releford, 148 Wn. App. 478, 490-91, 200 P.3d 729, review denied, 166 Wn.2d 1028 (2009).

In the interview at the hospital, Hansen told the police that the two upper receivers could be swapped out onto his AR-15 firearm. He confirmed he had three different upper receivers for the AR-15 firearm and stated that "my AR platform comes with three different types of guns." Smelser, the State's firearms expert, testified that he expected the two upper receivers at issue would clip onto the lower receiver of Hansen's AR-style firearm. Given this evidence, the two upper receivers are appropriately viewed as part of a disassembled AR-15 firearm that could be rendered operational with reasonable effort and within a reasonable time period. They are "firearms" within the meaning of the statute.

At the forfeiture hearing, the State represented to the trial court that it was seeking forfeiture only of the magazines and ammunition that were found inside the firearms in Hansen's possession. Hansen does not dispute the State's assertion that the magazines and ammunition in question were found inside the firearms. They were therefore a part of the firearms and were properly forfeited.

## STATEMENT OF ADDITIONAL GROUNDS

Hansen has filed a statement of additional grounds for review. A statement of additional grounds will not support review if it does not adequately inform the court of the nature and occurrence of the alleged errors. RAP 10.10(c); State v. Alvarado, 164 Wn.2d 556, 569, 192 P.3d 345 (2008).

Hansen claims the trial court erred in giving jury instruction 7, "Evidence of mental illness or disorder may be taken into consideration in determining whether the defendant had the capacity to act with premeditation, intentionally, recklessly, or willfully." This is a pattern instruction for the diminished capacity defense. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 18.20, at 302 (4th ed. 2016) (WPIC). Hansen argues that this instruction relieved the State of its burden of proof. But the jury was properly instructed that the State had the burden of proving each element of each crime beyond a reasonable doubt. This claim does not support further review.

Hansen challenges the jury instructions defining recklessness and knowingly. These instructions were also pattern instructions, WPIC 10.02, at 222, and WPIC 10.03, at 225, and on this record, we see no basis for review.

Hansen claims trial counsel was ineffective in proposing or failing to object to the above pattern instructions. He also claims trial counsel was unreasonable in not presenting evidence that his mental illness prevented him from forming the requisite intent and that counsel did not adequately investigate this issue. But counsel did present the psychiatrist's testimony that Hansen was depressed and suicidal. Hansen's bare claim of ineffective assistance does not support a claim that more should have been done.

The State asks for an award of appellate costs as the substantially prevailing party on review. We exercise our discretion to decline the State's request for an award of costs. On the present record, there is no realistic basis to expect that Hansen will have the ability to pay. When a trial court makes a finding of indigency, that finding remains throughout review "unless the commissioner or clerk determines by a preponderance of the evidence that the offender's financial circumstances have significantly improved since the last determination of indigency." RAP 14.2. Hansen has been sentenced to serve more than 70 years. He was found indigent by the trial court. If the State has evidence indicating that Hansen's financial circumstances have significantly improved since the trial court's finding, the State may file a motion for costs with the commissioner.

The judgment and sentence is affirmed. The order of forfeiture is also affirmed.

Becker, J.

WE CONCUR:

Trickey, ACJ

Dwyer, J.