**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION  II**

| | |
|---|---|
| STATE OF WASHINGTON, | No.  49343-8-II |
| Respondent, | UNPUBLISHED OPINION |
| v. | |
| CARLOS E. PEREZ CALDERON, | |
| Appellant. | |

BJORGEN, C.J. — Carlos Perez Calderon appeals his conviction of second degree murder.

Calderon argues that the superior court erred when it (1) allowed the State to file an amended information arising from prosecutorial vindictiveness, (2) admitted his custodial interrogation into evidence, (3) declined to instruct the jury on the lesser included offenses of first and second degree manslaughter, and (4) declined to instruct the jury on self-defense.

Finding no error, we affirm.

## FACTS

### A.     Substantive Facts

Calderon asked his ex-girlfriend, Amanda "Mindy"[1] Hughes, to watch his house and dog for an extended period of time because he had an upcoming military assignment at the Yakima Training Center.  Hughes and her two young daughters, MC, age nine, and GH, age five, began staying with Calderon during the week before his departure for Yakima.

MC testified that "Carlos and my mom were fighting . . . [b]ecause my mom wanted to go to the food bank.  And . . . Carlos wouldn't take her, or something like that."  Verbatim

---

[1] The amended information identifies the decedent as Mindy Hughes.  However, her mother, Tonya Schrock, identifies her as Amanda Hughes.  We use the name her mother provided.

Report of Proceedings (VRP) (June 28, 2016) at 287. MC testified her mom "grabbed some metal thing and threw it at him." VRP (June 28, 2016) at 288, 305. She testified Calderon "was laying down on the couch . . . [and] saying mean things." VRP (June 28, 2016) at 288. MC said she initially witnessed them arguing, but Hughes told her to go to her room where she could only hear "them fighting . . . saying cuss words to each other and stuff." VRP (June 28, 2016) at 287-89. MC testified she heard "something . . . go, boom" and remembered a gun was lying on the living room table. VRP (June 28, 2016) at 290, 296. The prosecutor asked, "Did you see him with a gun in his hand at any point in time?" MC responded, "I think so, but I don't know." VRP (June 28, 2016) at 292. She added, "I don't know if I really did. I thought so, but I don't know." VRP (June 28, 2016) at 296. MC testified she did not see the gun go off, but heard it.

Calderon's friend, Ivan Montes, testified that they had been working on a car engine earlier that day at Calderon's house. Montes left to run some errands, and when he returned, he saw Calderon on the phone with 911 and Hughes lying on the floor. Montes testified as follows:

> [Montes]: Carlos told me that, "We got into a fight. She got mad at me and she flipped the table. My gun was on the table. It went off. She's been shot." That was after I got the dogs out. So immediately after that, I asked him where the hell is the gun. Those were my exact words to him. I looked around. He says he couldn't find it. He didn't know where it was.
> [Defense]: Did you find the gun?
> [Montes]: Yes, I'm the one who recovered the gun. I cleared the weapon and secured it next to a metal tin container next to the microwave.
> [Defense]: Where did you find the gun?
> [Montes]: It was not close – it wasn't anywhere in line, or near Mindy.

VRP (June 28, 2016) at 241.

When Officer Michael Wulff and other officers arrived on scene, they ordered everyone out of the house and then heard a man yell, "I am doing CPR [cardiopulmonary resuscitations]. Get in here." VRP (June 27, 2016) at 161-62. Wulff testified that when he entered the house, "I observed a female laying on the floor in the corner of the living room. I observed she was

bleeding. I observed a male doing chest compressions, CPR, and another male standing up next to her." VRP (June 27, 2016) at 162.

> Officer Joe Kolp testified:

> When I entered the house, it was sort of chaotic. I observed a female on the floor to my right. Her feet were facing me. There were two males performing medical aid on the female. There seemed to be a large amount of blood there. The gentleman on the right was on his knees conducting what I recall to be CPR compressions. The gentleman on the left was on his knees, and he appeared to be what I recall to be like holding a pressure type using his hand over what appeared to be a wound on the victim's chest.

VRP (June 27, 2016) at 178-79. Kolp stated that Calderon was holding the wound, compressing it, and had a lot of blood on him. He observed that Calderon appeared to be in a "panic state." VRP (June 27, 2016) at 188.

Wulff testified that he "asked what happened, trying to figure out generally what had occurred." VRP (June 27, 2016) at 164. "[Calderon] said he and the female had been in an argument about her wanting to go to the food bank. During the argument, she flipped the table over. The gun had gone off and hit her in the chest." VRP (June 27, 2016) at 164. Wulff testified Calderon stated, "The gun was on the table and it went off and hit her in the chest." VRP (June 27, 2016) at 174-75.

Officer Paul Osness testified that he walked into the house and "saw what appeared to be a living room table on its top." VRP (June 27, 2016) at 193. Osness testified that one of the officers stated the gun was secured and directed him to the gun, which was unloaded and sitting in a bowl, in the kitchen, 10 to 15 feet away from the victim.

Kolp testified that while he was walking Calderon to his patrol car and after advising him of his *Miranda* rights, Calderon said, "We were arguing. She flipped the table. The gun went off." VRP (June 27, 2016) at 180. Kolp also testified Calderon stated that "he was laying [sic]

3

on the couch, she began to scream at him for not going to the food bank." VRP (June 27, 2016) at 181.

Detective Reynaldo Punzalan testified that he interrogated Calderon at the Lakewood Police Station after the shooting occurred. Calderon told Punzalan that "they had an argument about food in the house." VRP (June 28, 2016) at 357. Calderon said that "she had swatted him with an ACU [Army combat uniform] digital camouflage shirt top" and threw a glass chalice at him, which hit him and broke. VRP (June 28, 2016) at 357-58. He said Hughes then flipped the living room table towards him and that the gun was lying on the table. VRP (June 28, 2016) at 359. Calderon told Punzalan, "I'm a gun guy," when asked about his familiarity with firearms. VRP (June 28, 2016) at 359.

Punzalan testified on cross examination as follows:

> [Defense]: Yesterday you testified he was – well, you said it was unclear as to what happened; is that correct?
> [Punzalan]: With regard to the point of how the weapon discharged, I don't think that was ever explained by Mr. Perez Calderon.
> [Defense]: He said he didn't know; is that right?
> [Punzalan]: [He] never explained it.
> [Defense]: He said he didn't know how it went off?
> [Punzalan]: Yes, sir.
> [Defense]: He was consistent through that. You asked him several times?
> [Punzalan]: Right. That is correct.
> [Defense]: So he was never, ever able – other than hearing the gun go off, to give you – he said he just didn't know, right?
> [Punzalan]: That is correct.
> [Defense]: He said the gun was not in his hand, right?
> [Punzalan]: Yes.
> [Defense]: He said it happened when he was turning away after she was either swinging something at him or throwing something at him?
> [Punzalan]: Right, flipping the table.
> [Defense]: Flipping the table. Were you aware the table was found on its top?
> [Punzalan]: Yes.

VRP (June 29, 2016) at 378-79. Calderon's attorney continued with this line of questioning:

4

> [Defense]: You keep asking him questions and ask him possibilities that may have happened?
> [Punzalan]: Certainly.
> [Defense]: Part of your possibility, is it could have inadvertently gone off if it was in [Calderon's] hand when she flipped the table. That was one scenario you gave?
> [Punzalan]: Right.
> [Defense]: When he was turning or something?
> [Punzalan]: Grabbed it inadvertently as the table flipped, as the table was coming toward him. A lot of possibilities.
> [Defense]: A lot of possibilities in this case. He was consistent he didn't know how it happened?
> [Punzalan]: Yes.
> [Defense]: The only thing we know for sure is it went off and she died as a result?
> [Punzalan]: Correct.

VRP (June 29, 2016) at 388-89.

B.      Procedural Facts

1. Amendment to the Information

The State initially charged Calderon by information with the crime of second degree murder: the information incorporated a firearm enhancement and characterized the offense as domestic violence, but did not allege any aggravating factors. The State subsequently filed an amended information, adding the alternative charge of felony murder with second degree assault as the predicate crime. Under both alternatives—second degree murder and felony murder—the amended information added domestic violence aggravating factors because the offense occurred in the presence of a child.

Calderon objected and raised the issue of prosecutorial vindictiveness; he claimed the State retaliated because he did not accept its plea deal. Calderon also claimed any amendment would prejudice him because the State brought the motion the day trial proceedings commenced and it increased the potential punishment Calderon faced. The State claimed no prejudice

existed, the plea offer remained open, and that it had provided defense counsel with notice.

Defense counsel acknowledged that the State provided him with notice of its intent to amend the

information approximately three weeks prior to trial. Calderon did not request a continuance.

The superior court granted the amendment to the information.

2. CrR 3.5 Ruling

At a CrR 3.5 hearing, Calderon sought to exclude the entire custodial interrogation that

Punzalan and Detective Christopher Bowl had conducted. In its findings of facts and

conclusions of law regarding Calderon's CrR 3.5 motion, the court concluded that Punzalan and

Bowl had properly notified Calderon of his *Miranda*[2] rights and that Calderon had made a

knowing and voluntary waiver.

The superior court found, among other matters, that (1) Kolp walked Calderon to the

police car and advised Calderon of his *Miranda* rights; (2) Kolp did not question Calderon, but

Calderon made statements to Kolp; (3) Calderon was detained and transported to the police

station; (4) Punzalan met with Calderon at the police station; (5) Calderon was not free to leave

the room without police escort; (6) Punzalan briefly informed him that the interview would be

recorded; (7) Punzalan confirmed the preliminary notice of recording the interview with

Calderon and pointed out a sign hanging on the wall in the interview room that informed persons

that interviews in that room were being recorded; (8) Punzalan had Calderon read the advisement

on the wall aloud; (9) all of the contact between the officers and Calderon in the interview room

were recorded; (10) Punzalan advised Calderon of his *Miranda* rights by reading aloud from a

form while Calderon read the rights from a separate form; (11) Calderon signed the *Miranda*

waiver form; (12) Calderon spoke with the police and answered their questions; (13) during the

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

interview, Punzalan usually spoke with a normal tone, but he was sometimes loud and confrontational; (14) Calderon was notified twice that the interview would be recorded; (15) Punzalan was with Calderon off and on between 5:46 p.m. and 8:19 p.m.; and (16) two minor children were present when the shooting occurred.

> More specifically related to the custodial interrogation issue, the court ruled:
>
> 4. The interviewers, including Detective Punzalan, were allowed to challenge the defendant's statements and to use a variety of tactics or techniques when trying to elicit information from the defendant with regard to the facts and circumstances leading up to, and during the fatal domestic violence incident.
>
> 5. The detectives' methods did not overcome the defendant's will. Throughout the investigation into Ms. Hughes' death, even beginning with the 911 call, the defendant consistently asserted that the gun "went off"; whether by accident or through some mechanical malfunction. The defendant never admitted or conceded criminal behavior involving Ms. Hughes' death.

Clerk's Papers (CP) at 189-89. The superior court ultimately admitted Calderon's custodial statements into evidence.

3. Jury Instructions

The case went to jury trial. Before deliberations, Calderon took exception to the superior court's denial of his offered instructions 6, 11, 12, 13, 14, and 16 and to the court's designated supplemental instructions 1, 2, and 3. The first group of exceptions pertained to Calderon's request for instructions on the lesser included offenses of first and second degree manslaughter.[3]

---

[3] Instruction 6 is the instruction on the lesser included offenses of first and second degree manslaughter using *Washington Pattern Jury Instructions—Criminal* (WPIC) 4.11. Instruction 11 provides the definition of "first degree manslaughter" using WPIC 28.01. Instruction 12 provides the definition of "recklessness" using WPIC 10.03. Instruction 13 outlines the elements of first degree manslaughter using WPIC 28.02. Instruction 14 provides the definition of "second degree manslaughter" using WPIC 28.05. Instruction 15 provides the definition of "criminal negligence" using WPIC 10.04. Instruction 16 outlines the elements of second degree manslaughter using WPIC 28.06.

The second group of exceptions pertained to Calderon's claim of self-defense.[4]  The superior

court declined to provide the proposed instructions Calderon requested related to the lesser

included offenses and self-defense, but gave an instruction on excusable homicide.

### 4.  Verdict

The jury found Calderon guilty of second degree murder without specifying which

alternative charges it relied on.  The jury unanimously agreed that Calderon was armed with a

firearm at the time of the commission of the crime.  The jury also found Calderon committed an

aggravated domestic violence offense.

Calderon appeals.

## ANALYSIS

### I. PROSECUTORIAL VINDICTIVENESS

Calderon argues that after he declined to accept the State's plea deal, the prosecution

acted vindictively when it filed a motion to amend the information.  Consequently, Calderon

claims the superior court erred when it allowed the State to file its amended information.  We

disagree.

### A.    Standard of Review

We review a superior court's ruling on a proposed amendment to an information for an

abuse of discretion.  *State v. Lamb*, 175 Wn.2d 121, 130, 285 P.3d 27 (2012).  A superior court

abuses its discretion when its decision is manifestly unreasonable or exercised on untenable

grounds or for untenable reasons.  *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007).

---

[4] Supplemental jury instruction 1 is the WPIC 17.02 *Lawful Force—Defense of Self, Others, Property* instruction.  Supplemental jury instruction 2 is the WPIC 17.04 *Lawful Force—Actual Danger Not Necessary* instruction.  Supplemental jury instruction 3 is the WPIC 17.05 *Lawful Force—No Duty to Retreat* instruction.

Such is the case when the superior court relies on unsupported facts, takes a view that no reasonable person would take, applies an incorrect legal standard, or bases its ruling on an erroneous legal view. *Id.* at 284.

B.        The Prosecutor Did Not Act Vindictively

Constitutional due process principles prohibit prosecutorial vindictiveness. *State v. Korum*, 157 Wn.2d 614, 627, 141 P.3d 13 (2006). "'[A] prosecutorial action is 'vindictive' only if [it is] designed to penalize a defendant for invoking legally protected rights.'" *Korum*, 157 Wn.2d at 627 (quoting *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987)). A defendant in a pretrial setting bears the burden of proving either "'(1) actual vindictiveness, or (2) a realistic likelihood of vindictiveness which will give rise to a presumption of vindictiveness.'" *State v. Bonisisio*, 92 Wn. App. 783, 791, 964 P.2d 1222 (1998) (quoting *United States v. Wall*, 37 F.3d 1443, 1447 (10th Cir.1994)). The defendant must show actual vindictiveness through objective evidence that a prosecutor acted in order to punish him for standing on his legal rights. *Meyer*, 810 F.2d at 1245. A presumption of vindictiveness arises when a defendant can prove that "'all of the circumstances, when taken together, support a realistic likelihood of vindictiveness.'" *Korum*, 157 Wn.2d at 627 (quoting *Meyer*, 810 F.2d at 1246). The mere filing of additional charges after a defendant refuses a guilty plea cannot, without more, support a finding of vindictiveness. *Id.* at 629, 631.

Calderon fails to show either actual vindictiveness or the basis for a presumption of vindictiveness. The State's pretrial filing of the amended information does not support Calderon's claim of vindictiveness. The prosecutor has discretion to determine the number and severity of charges to bring against a defendant. *Korum*, 157 Wn.2d at 627; *see also State v. Rice*, 174 Wn.2d 884, 901, 279 P.3d 849 (2012); *State v. Lewis*, 115 Wn.2d 294, 299, 797 P.2d

1141 (1990). Calderon does not assert that the prosecutor lacked probable cause for (1) the added alternative charge of felony murder with second degree assault as the predicate or (2) the domestic violence aggravating factors because the offense occurred in the presence of a child. *See, e.g.*, *Korum*, 157 Wn.2d at 632-33. Prosecutorial vindictiveness "will not be found where the only showing of vindictiveness is the pretrial addition of new charges supported by probable cause." *Id*. at 670-71.

Although Calderon objected during pretrial motions claiming vindictiveness and retaliation, he has not pointed to any evidence on the record to support his argument that the State added the alternative charge and aggravating factors because he declined the State's plea deal. Further, Calderon's counsel acknowledged that the State provided him with notice of its intent to amend the information approximately three weeks prior to trial. Calderon failed to show how the prosecutor acted vindictively: he failed to show how the prosecutor penalized him for exercising constitutional or statutory rights, and he failed to show how the circumstances support a realistic likelihood of vindictiveness. Therefore, Calderon did not meet his burden of proving prosecutorial vindictiveness.

The prosecutor did not act vindictively, and the superior court did not abuse its discretion when it allowed the State to file an amended information.

## II. CRR 3.5 RULING

Calderon contends that the superior court erred when it admitted his recorded custodial interrogation into evidence because (1) Punzalan did not ask him if English was his native language, (2) Punzalan stated his failure to provide a statement would result in a forensic interview of Hughes' children, (3) the interrogation lasted for hours, and (4) Punzalan repeatedly used profanities. Calderon claims the totality of the circumstances show that the police coerced his confession. We disagree.

A.     Standard of Review

We review a superior court's ruling on a motion to suppress evidence to determine whether substantial evidence supports its findings of fact and whether the findings of fact support its conclusions of law. *State v. Russell*, 180 Wn.2d 860, 866-67, 330 P.3d 151 (2014). Unchallenged findings of fact are verities on appeal. *State v. Homan*, 181 Wn.2d 102, 106, 330 P.3d 182 (2014).

B.     Calderon Provided a Knowing, Intelligent, and Voluntary Waiver

The Fifth Amendment and the Washington Constitution guarantee the right against self-incrimination. U.S. CONSTITUTION amends. V, XIV; WASH. CONSTITUTION art. I, § 9. Before a defendant's custodial statements can be used against him, the State must demonstrate that the defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights. *State v. Radcliffe*, 164 Wn.2d 900, 905-06, 194 P.3d 250 (2008).

The State bears the burden of proving that a suspect knowingly, voluntarily, and intelligently waived his *Miranda* rights. *State v. Mayer*, 184 Wn.2d 548, 556, 362 P.3d 745 (2015). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979)). Circumstances that are potentially relevant in the totality of the circumstances analysis include whether there was police coercion;

> the length of the interrogation; its location; its continuity; the defendant's maturity, education, physical condition, and mental health; and whether the police advised the defendant of the rights to remain silent and to have counsel present during custodial interrogation.

*State v. Unga*, 165 Wn.2d 95, 101, 196 P.3d 645 (2008).

Calderon did not challenge the superior court's written findings of fact, so they are verities on appeal. *Homan,* 181 Wn.2d at 106. The superior court found the following, among other matters: Kolp walked Calderon to the police car and advised Calderon of his *Miranda* rights; Kolp did not question Calderon, but Calderon made statements to Kolp; Calderon was detained and transported to the police station; Punzalan met with Calderon at the police station; Calderon was not free to leave the room without police escort; Punzalan briefly informed him that the interview would be recorded; Punzalan confirmed the preliminary notice of recording the interview with Calderon and pointed out a sign hanging on the wall in the interview room that informed persons that interviews in that room were being recorded; Punzalan had Calderon read the advisement on the wall aloud; all of the exchanges between the officers and Calderon in the interview room were recorded; Punzalan advised Calderon of his *Miranda* rights by reading aloud from a form while Calderon read the rights from a separate form; Calderon signed the *Miranda* waiver form; Calderon spoke with the police and answered their questions.

Based on the superior court's unchallenged findings, the police adequately advised Calderon of his *Miranda* rights and Calderon understood those rights when he signed the *Miranda* waiver. The superior court's findings of fact directly support its conclusion that Calderon knowingly, voluntarily, and intelligently waived his *Miranda* rights.

C.     The Police Did Not Overbear Calderon's Will

Apart from the validity of a *Miranda* waiver, any use of the defendant's involuntary statement against him in a criminal trial denies him due process of law, regardless of the other evidence against him. *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978). The inquiry into voluntariness is necessarily fact-specific. *Gallegos v. Colorado*, 370 U.S. 49, 52, 82 S. Ct. 1209, 8 L. Ed. 2d 325 (1962). In that inquiry, we consider whether, under

12

the totality of the circumstances, including the suspect's powers of resistance and the pressure brought to bear by the interrogators, the "'defendant's will was overborne.'" *Dickerson v. United States*, 530 U.S. 428, 434, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)).

First, although the police did not ask Calderon if English was his native language, Calderon spoke English with the police and answered their questions. In fact, Punzalan had the defendant read the *Miranda* advisement aloud. Calderon does not cite any authority to support the proposition that a custodial interrogation must be conducted in the defendant's native or favored language where the defendant has the ability to converse in, and comprehend, English.

Second, although Punzalan did advise Calderon he did not "want to have to put [Hughes' children] through a forensic interview," but would "if [he] had to," the fact remains that the police did conduct a forensic interview of the children as a part of its investigation. VRP (June 22, 2016) at 62. Punzalan testified that advising Calderon that they might interview the children was a "[m]atter of fact" because it is routine "[i]nvestigative procedure." VRP (June 22, 2016) at 62.

Third, Punzalan interrogated Calderon off and on between 5:46 p.m. and 8:19 p.m. However, in this context, a custodial interrogation lasting approximately two and half hours or more is not unusual. *See, e.g.*, *Berghuis v. Thompkins*, 560 U.S. 370, 130 S. Ct. 2250, 176 L. Ed. 2d 1098 (2010) (a custodial interrogation concerning an alleged shooting was not coercive where the defendant remained silent during first two hours and forty-five minutes of a three hour interrogation).

Finally, even though Detective Punzalan employed "loud and confrontational" tactics at times, for the most part he spoke in a normal tone, and the superior court observed that "[t]he

13

interviewers, including Detective Punzalan, were allowed to challenge the defendant's statements and to use a variety of tactics or techniques when trying to elicit information from the defendant with regard to the facts and circumstances leading up to, and during the fatal domestic violence incident." CP at 187-89. Calderon does not offer argument or authority that any of the tactics or techniques used coerced him or overcame his will. As a final point, the superior court found "[t]he detectives' methods did not overcome the defendant's will." CP at 189.

With the superior court's findings of fact treated as verities on appeal, the totality of the circumstances do not suggest the police coerced Calderon. Accordingly, we hold the superior court properly admitted Calderon's custodial statements into evidence.

### III. JURY INSTRUCTIONS: LESSER INCLUDED OFFENSES

Calderon assigns error to the superior court's refusal to give the jury instructions on first and second degree manslaughter. We disagree.

A.      Standard of Review

We review the adequacy of jury instructions based on an error of law de novo. *State v. Clausing*, 147 Wn.2d 620, 626-27, 56 P.3d 550 (2002). However, where the superior court refuses to give an instruction based on the facts of the case, we review a superior court's refusal to give a requested jury instruction for abuse of discretion. *State v. Henderson*, 180 Wn. App. 138, 145, 321 P.3d 298 (2014); *State v. Hunter*, 152 Wn. App. 30, 43, 216 P.3d 421 (2009); *State v. Hernandez*, 99 Wn. App. 312, 318, 997 P.2d 923 (1999). A superior court abuses its discretion when its decision is manifestly unreasonable or based upon untenable grounds or untenable reasons. *State v. Neal*, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001). A superior court's decision is based on untenable grounds or untenable reasons if it is based on an incorrect legal standard. *State v. Dye*, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013).

B.     Legal Principles

A defendant is entitled to an instruction on a lesser included offense if two conditions are met. *State v. Berlin*, 133 Wn.2d 541, 545, 947 P.2d 700 (1997); *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978). First, under the legal prong, each of the elements of the lesser offense must be a necessary element of the greater charged offense. *Berlin*, 133 Wn.2d at 545-46; *Workman*, 90 Wn.2d at 447-48. Second, under the factual prong, the evidence "must raise an inference that *only* the lesser included . . . offense was committed to the exclusion of the charged offense." *State v. Fernandez-Medina*, 141 Wn.2d 448, 455, 6 P.3d 1150 (2000).

When determining if the evidence at trial was sufficient to support the giving of an instruction, we view the supporting evidence in the light most favorable to the party that requested the instruction. *Id*. at 455-56. Nevertheless, the evidence must affirmatively establish the defendant's theory of the case; it is not enough that the jury might disbelieve the evidence pointing to guilt. *Id*. at 456. In addition, the superior court "must consider all of the evidence that is presented at trial when it is deciding whether or not an instruction should be given." *Id*. at 456.

To commit second degree murder a defendant must act with intent to cause the death of another person without premeditation. RCW 9A.32.050. A person is guilty of first degree manslaughter when he or she recklessly causes the death of another person. RCW 9A.32.060. A person

> is reckless or acts recklessly when he or she knows of and disregards a substantial risk that a wrongful act may occur and his or her disregard of such substantial risk is a gross deviation from conduct that a reasonable person would exercise in the same situation.

RCW 9A.08.010(1)(c). A person is guilty of second degree manslaughter when he or she causes the death of another with criminal negligence. RCW 9A.32.070. A person

15

is criminally negligent or acts with criminal negligence when he or she fails to be aware of a substantial risk that a wrongful act may occur and his or her failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable person would exercise in the same situation.

RCW 9A.08.010(1)(d).

C.      The Evidence Does Not Support Jury Instructions on Lesser Included Offenses

In *Berlin*, 133 Wn.2d at 550-51, our Supreme Court held that first and second degree manslaughter are lesser included offenses of second degree murder.[5]  Therefore, because the legal prong of the *Workman* test is satisfied, the only question before us is whether the factual prong for first or second degree manslaughter is satisfied.

The superior court relied on *Hernandez*, 99 Wn. App. 312, in declining to give Calderon's proposed lesser included instructions.  In *Hernandez*, the defendant called 911 and stated that his girlfriend had been shot in the chest.  He first insisted that he was not present at the time of the shooting, but then stated that "the shooting had been an accident."  99 Wn. App. at 315.  In a recorded statement, Hernandez explained that he heard his girlfriend shoot the gun in the dining room and he "immediately got up.  [He] went towards her to grab the gun and she went into the kitchen.  [He] grabbed the gun.  She fell down.  She hit the floor."  *Id*. at 316, 319.  Hernandez then stated, "I could have grabbed [the gun] though . . . I don't know."  *Id*. at 316, 320.

The court stated that Hernandez "did not specifically describe any physical acts that explain how [Hughes] was shot.  He did not establish that he touched the gun before the bullet that killed [her] was fired."  *Id*. at 320.  Because the lesser included offenses of first and second

---

[5] *Cf. State v. Gamble*, 154 Wn.2d 457, 460, 114 P.3d 646 (2005) (holding that "manslaughter is not a lesser included offense of second degree felony murder where second degree assault, RCW 9A.36.021(1)(a), is the predicate felony").

degree manslaughter "require a finding that the accused actually caused the death of another," the court found that Hernandez had not established "affirmative evidence that he committed first or second degree manslaughter and not second degree murder." *Id.*

In this case, Calderon claimed he did not know how the gun fired and struck Hughes; he similarly suggested it was an accident. In this respect, we cannot distinguish this case from *Hernandez* because Calderon cannot affirmatively establish the elements of first and second degree manslaughter.

Calderon points us to *State v. Hunter*, 152 Wn. App. 30, 216 P.3d 421 (2009), as analogous to the facts of his case. In *Hunter*, the defendant called 911 stating that he was suicidal. *Id*. at 33. When the police responded to the scene, an officer called into the apartment and Hunter answered, "I've got a gun in my mouth. I'm in the bathroom, and I have a gun in my mouth." *Id*. at 33-34. Hunter stated, "I killed my girlfriend," and "[i]t was an accident." *Id*. at 34. At trial, Hunter testified that he "really d[id]n't know" what happened. *Id*. at 37 (alteration in original). However, he admitted on cross examination that he shot his girlfriend in the face. *Id*. at 38. Hunter also stated, "I really don't even remember pulling the trigger, if the trigger was pulled." *Id*. at 39.

In *Hunter* we distinguished *Hernandez* because Hunter was able to establish the elements of first and second degree manslaughter—Hunter admitted to shooting his girlfriend, but Hernandez did not describe any physical acts that explained the shooting. *Id*. at 47. We reasoned that "Hunter's testimony that the shooting was an accident raised the inference that Hunter was guilty only of manslaughter and not murder," but the inference giving rise to the "accident" manslaughter jury instruction clearly derived from Hunter's testimony that he unintentionally shot the victim in the face. *Id*.

Here, Calderon did not make any statements that he "accidently" shot Hughes. He did not describe any physical acts that explained the shooting besides his theory that it misfired when Hughes flipped the living room table over. His case is more analogous to *Hernandez.*

The evidence viewed in the light most favorable to Calderon does not raise an inference that he committed only first or second degree manslaughter to the exclusion of second degree murder. Calderon argues that part of Punzalan's testimony provides affirmative evidence that he committed only first or second degree manslaughter. During his custodial interrogation, Punzalan asked Calderon questions about how Hughes was shot and whether Calderon may have shot her inadvertently. One possibility Punzalan presented involved whether Calderon "[g]rabbed it [the gun] inadvertently as the table flipped, as the table was coming toward him." VRP (June 29, 2016) at 388-89. However, Calderon did not adopt Punzalan's suggestion and instead consistently stated he did not know how the gun fired. Calderon maintained he did not handle the gun. Although on appeal Calderon claims that he "acknowledged" this possibility, trial testimony from multiple officers suggests the opposite—Calderon consistently denied any knowledge regarding how the gun discharged. Br. of Appellant at 12; Reply Br. of Appellant at 3. Punzalan's testimony does not "describe any physical acts" or affirmatively "establish that he touched the gun" before it discharged. *Hernandez*, 99 Wn. App. at 320. The lesser included offenses of first and second degree manslaughter require affirmative evidence that Calderon recklessly or negligently caused Hughes death. On the record, he has not made such a showing.

Accordingly, we hold the superior court did not abuse its discretion when it declined to instruct the jury on the lesser included offenses. The evidence viewed in the light most favorable to Calderon does not raise an inference that he committed only first or second degree manslaughter to the exclusion of second degree murder.

18

IV. JURY INSTRUCTIONS: SELF-DEFENSE

Calderon claims that the superior court erred when it refused to instruct the jury on the law of self-defense. We disagree.

A.      Standard of Review

Our standard of review depends on the reason the superior court refused to grant Calderon's requested self-defense jury instruction. *State v. Walker*, 136 Wn.2d 767, 771, 966 P.2d 883 (1998). If the superior court declined the self-defense jury instruction based on a factual dispute, we review its decision for abuse of discretion. *Id*. at 771-72. If the superior court declined the self-defense jury instruction based on a ruling of law, we review its decision de novo. *Id*. at 772.

Here, the superior court stated, "I don't think it is appropriate to give self-defense instructions in a case of this nature. In particular, when it is a defense – self-defense dealing with the Assault 2 in a Felony Murder situation." VRP (July 6, 2016) at 599. Ostensibly, the superior court determined such an instruction would be legally improper where the State alternatively charged Calderon with felony murder with second degree assault as the predicate. Accordingly, we review Calderon's claim de novo.

B.      Legal Principles

A defendant is entitled to a self-defense jury instruction when there is "some evidence admitted in the case from whatever source which tends to prove [that an act was committed] in self-defense." *State v. McCullum*, 98 Wn.2d 484, 488, 656 P.2d 1064 (1983). In determining whether some evidence supported instructing the jury on self-defense, we review the entire record in a light most favorable to the defendant. *State v. Callahan*, 87 Wn. App. 925, 933, 943 P.2d 676 (1997). "Because the defendant is entitled to the benefit of all the evidence," a superior

court may be required to instruct the jury on self-defense instruction even where the defendant's own testimony is inconsistent with a self-defense claim. *Id*. at 933. "The law [of self-defense] does not require an explicit statement of intent." *State v. Hendrickson*, 81 Wn. App. 397, 401, 914 P.2d 1194 (1996). Further, "[t]he defenses of accident and self-defense are not mutually exclusive as long as there is evidence of both." *State v. Werner*, 170 Wn.2d 333, 337, 241 P.3d 410 (2010).

There are three elements to a claim of self-defense: (1) the defendant subjectively feared that he was in imminent danger of death or great bodily harm, (2) the defendant's belief was objectively reasonable, and (3) the defendant exercised no more force than reasonably necessary. *Werner*, 170 Wn.2d at 337. If the evidence fails to support any one of these elements, the defendant is not entitled to present a self-defense theory to the jury. *Walker*, 136 Wn.2d at 773.

C.      The Evidence Does Not Support Jury Instructions on Self-Defense

The superior court was required to consider all the evidence at trial in a light most favorable to Calderon when determining whether he was entitled to a self-defense instruction. *Callahan*, 87 Wn. App. at 933. If some evidence supported Calderon's self-defense theory, the superior court was required to instruct the jury on self-defense even where Calderon's own statements contradicted the theory. *Werner*, 170 Wn.2d at 337; *Callahan*, 87 Wn. App. at 933; *Hendrickson*, 81 Wn. App. at 401.

The evidence at trial, when viewed in a light most favorable to Calderon, did not support a jury instruction on self-defense. The evidence adduced at trial included the following: (1) Calderon and Hughes engaged in a hostile verbal altercation about food in the house, (2) Hughes swatted Calderon with an item of Army apparel while he laid on the couch, (3) Hughes threw a

glass chalice at Calderon, which hit him and broke, and (4) Hughes flipped the living room table toward Calderon, but it did not strike him.

Based on the evidence above, a reasonable jury could not find that Calderon subjectively feared that he was in imminent danger of death or great bodily harm from Hughes' actions or that his use of force was no more than necessary under the circumstances. On the record, there is no evidence that Calderon feared imminent bodily harm. More importantly, the use of deadly force in response to Hughes' alleged actions would be substantially more than necessary under the circumstances. Further, Calderon consistently asserted he did not know how the gun fired. For these reasons, he has not presented sufficient evidence warranting a self-defense jury instruction.

## CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Bjorgen, J.

We concur:

_____
Worswick, P.J.

_____
Melnick, J.