[No. 10479-6-III.   Division Three.   April 2, 1991.]

THE STATE OF WASHINGTON, *Respondent,* v. MICHAEL RAY MILLER, *Appellant.*

*Lewis M. Schrawyer,* for appellant.

*Donald C. Brockett, Prosecuting Attorney,* and *Steven Tucker, Deputy,* for respondent.

SHIELDS, A.C.J.—Michael Miller was convicted of vehicular homicide. He appeals, contending there was insufficient evidence he committed the crime, the court gave an unacceptable instruction on the legal definition of vehicular homicide, and the court erred in refusing to suppress the blood sample taken from him at the hospital. We affirm.

In the early hours of December 7, 1988, a 2–car accident occurred on Highway 395 just north of Spokane, which resulted in the death of Dorothy Garland. The actual facts of the accident are in dispute.

Muriel Konen was a passenger in the 1980 Dodge Omni driven by Ms. Garland, traveling southbound on the highway. Meanwhile, Michael Miller was traveling northbound in his 1968 Dodge van. Ms. Konen testified visibility was good, there was no problem observing the center line, the Omni was traveling 45 m.p.h.,[1] and was completely in the southbound lane. She suddenly noticed what she thought was a motorcycle, approaching in her southbound lane. She realized just before impact the vehicle was a van with one headlight missing.

Mr. Miller testified there was thick fog in the area, and he was traveling about 50 m.p.h. when he suddenly noticed headlights more than halfway over the center line in his

---

[1]The speed limit is 55 m.p.h.

northbound lane. He claims he veered to the left, the Omni began turning back into its proper lane, he had his low beams on, and both headlights were working. After impact, both vehicles came to rest in the southbound ditch.

Trooper Kermit Gagner was the first officer to arrive at the scene. He testified there were patches of fog in the area, but visibility was good. He noted traction sand covered some of the center line. He found a collision scrub mark, gouge marks, and debris.[2] The scrub mark was near the center line in the southbound lane; the three gouge marks, which he determined were caused by the Omni, were in the middle of the southbound lane and formed an arc from right to left. The majority of the debris found in the southbound lane came from the Omni. He testified he originally believed the scrub mark near the center line was from the left front tire of the Omni. However, he changed his mind once he reconstructed the accident on paper and concluded the mark came from the right rear tire of the van. Under either scenario, he was of the opinion the van was in the wrong lane, and the Omni did not cross the center line at any time.

Detective Powell Shoemaker testified he began working on the case hours later. He examined the van's headlights and determined both low beams worked, but the right high beam did not. He determined the right rear wheel of the van was in such condition it would lock up before the rest of the wheels when the brakes were applied. He believed the scrub mark was not caused by the left front tire of the Omni, but the right rear tire of the van. He therefore determined the van was "pretty much nearly all the way over the center line when it impacted with the Dodge Omni . . . ."

Mr. Miller's expert witness, an accident reconstructionist, testified the accident could not have occurred the way the

---

[2]A scrub mark is a short tire skid mark which happens at the time of impact. Gouge marks come from one of the vehicles being forced down onto the asphalt. The gouges come from the frame or the transmission housing of the vehicle.

police said it did. It was his opinion the damage on the Omni indicated the driver of the Omni turned to the right prior to impact; the scuff mark was made by the left rear tire of the van; both vehicles were in the northbound lane; and, therefore, the Omni was in the wrong lane. He also claimed there was no proof any of the headlights were out at the time of the accident. He further noted the State's theory the right high–beam headlight of the van was out, and the van was traveling in the wrong lane, would not coincide with Ms. Konen's testimony she believed the left high beam from the van was from a motorcycle traveling in its proper lane.

It was also revealed Mr. Miller had stopped at a bar prior to the accident and had consumed one 12–ounce beer and two 16–ounce beers. Patrolman Clark Indahl testified he interviewed Mr. Miller at the hospital and observed Mr. Miller's eyes were blood shot and watery, he had a thick coating on his tongue and a moderate odor of intoxicants. He admitted, however, he administered an alphabet field test on Mr. Miller, which Mr. Miller performed satisfacto- rily. Further, Mr. Miller's speech was good and he was cooperative. The officer also admitted bloodshot eyes could be caused by a number of reasons, including lack of sleep. Nevertheless, he gave his opinion Mr. Miller was under the influence of alcohol. A blood alcohol test revealed Mr. Miller had a level of .12 percent at 5:15 a.m. The State provided expert testimony that Mr. Miller's blood alcohol level would have been .16 percent at the time of the acci- dent.

██ Mr. Miller first contends there was insufficient evi- dence he committed vehicular homicide. The standard of review of the sufficiency of evidence to support a criminal conviction is set out in *State v. Green,* 94 Wn.2d 216, 616 P.2d 628 (1980). The critical inquiry is whether after view- ing the evidence in a light most favorable to the prosecu- tion, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Any challenge to the sufficiency of the evidence admits the

truth of the State's evidence and all inferences that reasonably can be drawn therefrom. *State v. Knowles,* 46 Wn. App. 426, 429, 730 P.2d 738 (1986).

■■ There are three alternate ways to commit vehicular homicide. Mr. Miller was charged with all three: (1) driving a motor vehicle while under the influence of intoxicating liquor and that condition[3] proximately causes the injury, which in turn proximately causes the victim's death; (2) driving a motor vehicle in a reckless manner, which proximately causes the injury, which in turn proximately causes the victim's death; or (3) driving with disregard for the safety of others, which proximately causes the injury, which in turn proximately causes the victim's death. Although the jury is not required to be unanimous as to a particular alternative when more than one is charged, the State must produce substantial evidence of each. *State v. Sanchez,* 42 Wn. App. 225, 232, 711 P.2d 1029 (1985), *review denied,* 105 Wn.2d 1008 (1986). Unless there is sufficient evidence as to each means by which the defendant was alleged to have committed the crime, the verdict must be set aside. *State v. Fateley,* 18 Wn. App. 99, 102, 566 P.2d 959 (1977).[4] Sufficient evidence means more than a mere scintilla of evidence; there must be that quantum of evidence necessary to establish circumstances from which the jury could reasonably infer the fact to be proved. *Fateley,* at 102. What must be shown to support a conviction for

---

[3]As we observed in *State v. McAllister,* 60 Wn. App. 654, 806 P.2d 772 (1991), the condition is negligent driving; intoxication alone is not enough. *See State v. MacMaster,* 113 Wn.2d 226, 778 P.2d 1037 (1989).

[4]*Fateley* was decided under former RCW 46.61.520 which provided:
"**Negligent homicide by motor vehicle—Penalty.** (1) When the death of any person shall ensue within three years as a proximate result of injury received by the driving of any vehicle by any person while under the influence of or affected by intoxicating liquor or drugs, or by the operation of any vehicle in a reckless manner or with disregard for the safety of others, the person so operating such vehicle shall be guilty of negligent homicide by means of a motor vehicle."

vehicular homicide under the first alternative is a combination of ordinary negligence[5] and intoxication[6] while driving which proximately caused the accident, resulting in death. What must be shown under the second alternative is "reckless driving", which has been defined as driving "in wilful or wanton disregard for the safety of persons or property . . .". RCW 46.61.500. WPIC 90.05 (Supp. 1986) defines it as "driving in a rash or heedless manner, indifferent to the consequences." What must be shown under the third alternative is "disregard for the safety of others", which has been defined as an aggravated kind of negligence or carelessness, falling short of recklessness, but constituting a more serious dereliction than the minor inadvertences and oversights deemed ordinary negligence. *State v. Eike*, 72 Wn.2d 760, 765-66, 435 P.2d 680 (1967). WPIC 90.05 (Supp. 1986) defines it as driving which, "by its character and the surrounding circumstances, manifests a heedless indifference to the probability that injury . . . will result . . .".

■ As to the first alternate means, the State submitted evidence that Mr. Miller's blood alcohol level several hours after the accident was .12 percent. The State's expert witness testified this indicated he had a level of .16 percent at the time of the accident. Thus, there was sufficient evidence to establish Mr. Miller was under the influence of intoxicating liquor. The State also proved Mr. Miller was driving in a negligent manner. Although conflicting evidence was presented, the State's witnesses testified Mr. Miller was

---

[5]WPIC 90.05 (Supp. 1986) defines ordinary negligence as the failure to exercise "ordinary care": the doing of some act a reasonably careful person would not do under the same or similar circumstances or the failure to do something which a reasonably careful person would have done under the same or similar circumstances. RCW 46.61.525 defines "operate in a negligent manner" as meaning "such a manner as to endanger or be likely to endanger any persons or property" and makes it a lesser included offense of operating a vehicle in a reckless manner.

[6]A person is deemed to be driving while under the influence of intoxicating liquor if the person has a blood alcohol level of .10 percent or more. RCW 46.61-.502.

traveling on the wrong side of the road with one headlight out. Credibility of witnesses is a matter for the jury. *State v. Franco,* 96 Wn.2d 816, 823, 639 P.2d 1320 (1982). If the State's witnesses are believed, and if the evidence and inferences are viewed in a light most favorable to the State, there was sufficient proof Mr. Miller was intoxicated, his intoxicated state caused him to drive in a negligent fashion, and his negligent driving was the proximate cause of Ms. Garland's injury and death. Thus, the State established sufficient evidence as to the first alternative. The evidence Mr. Miller was driving on the wrong side of the road with one headlight out also establishes recklessness and disregard for the safety of others, which would be sufficient to prove alternates two and three.

■ Mr. Miller next contends the court erred in giving instruction 7, because he claims that instruction improperly informed the jury it could find Mr. Miller guilty if he was driving while under the influence, even if the consumption of alcohol did not proximately cause the accident. He claims the instructions in this case were similar to the ones given in *State v. MacMaster,* 113 Wn.2d 226, 778 P.2d 1037 (1989), which were found unacceptable by the Supreme Court. We consider this contention even though the instructions were not objected to at trial, because instructional errors of constitutional magnitude may be challenged for the first time on review. The requirement that the jury be instructed as to each element of the offense charged is a constitutional one. *State v. Smith,* 56 Wn. App. 909, 913, 786 P.2d 320 (1990).

In *MacMaster,* at 229 (quoting instruction 5), the jury was given this instruction:

> To convict the defendant of the crime of vehicular homicide, each of the following elements of the crime must be proved beyond a reasonable doubt:
>
> . . . .
> (2) That at the time, the defendant:
>> (a) operated the motor vehicle and was under the influence of, or affected by intoxicating liquor, and thereby proximately caused injury to [decedent], . . ..

*MacMaster,* at 235, stated, "For defendant to be guilty of vehicular homicide, *the condition of impairment* due to alcohol must have been a proximate cause of the fatal accident." (Italics ours.) The condition of impairment is the negligent operation of the vehicle as pointed out by this court in *State v. McAllister,* 60 Wn. App. 654, 806 P.2d 772 (1991).

In the present case, the following instructions were given. Instruction 7 provided:

> A person commits the crime of vehicular homicide when he drives any vehicle while under the influence of intoxicating liquor or operates any vehicle in a reckless manner or with disregard for the safety of others and thereby proximately causes the death of any person within three years of such vehicle driving or operation.

This instruction, to which Mr. Miller objects, is identical to WPIC 90.01 (Supp. 1986) and basically recites the vehicular homicide statute, RCW 46.61.520.

Instruction 9 provided in part:

> To convict the defendant of the crime of Vehicular Homicide, each of the following elements of the crime must be proved beyond a reasonable doubt:
> 1. That on or about the 7th day of December, 1988, the defendant drove or operated a vehicle;
> 2. That at the time the defendant
> (a) was under the influence of intoxicating liquor *and that condition* was a proximate cause of injury to another person, . . ..

(Italics ours.) That instruction is identical to WPIC 90.02 (Supp. 1986).

██ Unlike this case, the court in *MacMaster* did not give WPIC 90.02 (Supp. 1986) as an instruction. Mr. Miller concedes WPIC 90.02 (Supp. 1986), given in this case as instruction 9, properly states the law. He argues, however, that giving one proper instruction and one erroneous instruction confused the jury and requires reversal. However, the effect of a particular phrase in an instruction must be determined by considering the instruction as a whole and reading it in the context of all the instructions given. *State v. Coe,* 101 Wn.2d 772, 788, 684 P.2d 668 (1984). A

jury instruction does not deprive a defendant of a fair trial if the instructions, when read as a whole, correctly state the applicable law, are not misleading, and allow each side to present its arguments. *State v. Holt,* 56 Wn. App. 99, 106, 783 P.2d 87 (1989), *review denied,* 114 Wn.2d 1022 (1990). A reviewing court should also consider whether the "to–convict" instruction contained a complete statement of all the elements of the offense charged. *Holt,* at 105. Here, the instructions, read as a whole, correctly state the applicable law. Unlike *MacMaster,* the "to–convict" instruction in this case, which mirrored WPIC 90.02 (Supp. 1986), properly instructed the jury it had to find the condition of impairment, negligent driving, due to alcohol proximately caused the injury. The court did not err in giving its instructions.

Last, Mr. Miller contends pro se the trial court erred in refusing to suppress the blood sample taken from him at the hospital, because the State did not have probable cause to arrest him for vehicular homicide. He argues absent a valid arrest, there is no implied consent, citing *State v. Wetherell,* 82 Wn.2d 865, 514 P.2d 1069 (1973).

The arresting officer need only have facts and circumstances within his knowledge sufficient to cause a reasonable person to believe an offense has been committed. He need not, at the time of arrest, have at his command the evidence to prove each element of the crime beyond a reasonable doubt. *State v. Knighten,* 109 Wn.2d 896, 903, 748 P.2d 1118 (1988). In *State v. Steinbrunn,* 54 Wn. App. 506, 511, 774 P.2d 55, *review denied,* 113 Wn.2d 1015 (1989), the court held the odor of intoxicants on the defendant's person was enough to establish probable cause to arrest after a head–on collision and fatality. Here, the officer not only smelled intoxicants, he had Mr. Miller's admission he had been drinking. Additionally, he knew the accident occurred near the center of the road, from which he could infer one of the parties had crossed over into the oncoming lane of traffic. Thus, there were sufficient facts to cause a reasonable person to believe an offense had been committed by Mr. Miller. Because the arrest was lawful, drawing

blood was also lawful. The court properly allowed the results of the test into evidence.

The decision of the Superior Court is affirmed.

MUNSON and THOMPSON, JJ., concur.