IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 79442-6-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| KEVIN WAYNE BREWER, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. — Kevin Wayne Brewer appeals his conviction for vehicular homicide arising out of the death of a bicyclist. He contends the trial court erred in admitting evidence of a corrective lens restriction on his driver's license and demonstrative evidence reconstructing the incident. He further contends there was insufficient evidence to support his conviction because the State failed to show he acted with disregard for the safety of others. Finally, he argues the trial court erred twice at sentencing; first, by considering facts outside the record for the purpose of sentencing and second, by ordering him to pay discretionary legal financial obligations (LFOs) without first inquiring after his ability to pay them.

We affirm Brewer's conviction, but remand for the sentencing court to make an individualized inquiry into Brewer's ability to pay discretionary LFOs and for the

court to determine the effect, if any, of the Supreme Court's decision in State v. Blake, __ Wn.2d __, 2021 WL 72832 (Feb. 25, 2021).[1]

FACTS

Shortly after 4 p.m. on September 21, 2016, Derek Blaylock was bicycling from the Northgate Transit Center in Seattle, Washington, to his son's elementary school. He was traveling southbound on First Avenue Northeast and was wearing a bright yellow cycling jersey, a black backpack and his helmet. The skies were clear and the weather was sunny.

Kevin Brewer was likewise traveling southbound on First Avenue Northeast, driving his Ford F-350 pickup truck home from the store. Brewer stopped at the traffic light at the intersection of First Avenue Northeast and Northeast 100th Street. When the light turned green, his truck did not move. After waiting for a long pause, the driver directly behind Brewer, Rachel Hagmann, honked her horn. After another short delay, Brewer began to drive again.

As Brewer caught up to Blaylock, his truck drifted or swerved to the right. Brewer crossed over the fog line and a three-foot wide shoulder and then drove the right front and rear wheels of his truck up onto a jersey barrier[2] running parallel to the roadway. From the visible damage on the jersey barrier, officers estimated Brewer's truck traveled at least 15 inches up the 30-inch tall jersey barrier, creating a 13 degree tilt and a 23 percent slope for the vehicle.

---

[1] On March 1, 2021, Brewer filed a motion for leave to add an assignment of error relating to his criminal history score based on Blake and to file supplemental briefing on the issue. We see no need for supplemental briefing and will remand the case for resentencing. We therefore deny Brewer's motion.

[2] The jersey barriers in that location were 12.5 feet long, 30 inches high, and set along the road to keep cars from leaving the roadway and to protect construction activities on the other side of the barriers.

As Brewer drove up the barrier, he struck Blaylock, pinning his body and bicycle between the right side of the truck and the concrete barrier. At some point, Blaylock was dislodged from his bicycle and fell to the pavement. Witnesses testified the truck then "crashed down, and it wiggled back and forth." Investigating officers testified that this movement occurred when Brewer's right rear truck tire ran over Blaylock's body. Blaylock died of blunt force injuries to his trunk and extremities.

Brewer did not stop despite Hagmann honking her horn again to get his attention. Witnesses testified that Brewer drove away erratically, speeding up and slowing down about three or four times. Brewer drove several blocks to his home on First Avenue Northeast, where he parked his truck in his driveway. Claudine Fisher, who was driving in the opposite direction on First Avenue Northeast, toward the collision, testified that Brewer turned so sharply in front of her into his driveway that she nearly "T-boned" the truck.

Hagmann followed Brewer to his home and approached him as he got out of his truck. Brewer told her that he was okay, to which she replied, "the guy you hit isn't." When Hagmann told him he had hit a bicyclist, Brewer walked back to the scene of the accident.

Officer Jordan Wallace, the first officer to arrive at the scene, interviewed witnesses and Brewer. When Brewer identified himself as the driver involved in the accident, Officer Wallace asked to see his driver's license, proof of insurance, and vehicle registration. Brewer gave the officer his driver's license and walked back to his truck to retrieve the other documents.

Officer Wallace gave Brewer's license to Drug Recognition Expert (DRE) Detective Michael Lewis, who arrived on scene to interview Brewer. Detective Lewis noticed the license had a restriction requiring Brewer to wear corrective lenses when operating a motor vehicle. When Detective Lewis asked Brewer about the restriction, Brewer responded that "he used to wear contacts, but he now wears glasses, but that he only wore them at night to drive."

Detective Lewis testified that during his interview with Brewer, he was lucid, responded appropriately to his questions, and was not "suffering from any sort of altered mental status." After running several field sobriety tests, Detective Lewis concluded that Brewer was not impaired by drugs or alcohol at that time.

The State charged Brewer with vehicular homicide pursuant to RCW 46.61.520(1)(c) and felony hit and run pursuant to RCW 46.52.020(1), (4)(a). The jury convicted Brewer of vehicular homicide but was unable to reach a verdict on the felony hit and run charge. Based on his offender score of six, Brewer's standard sentencing range was 57-75 months of imprisonment. The court imposed a high-end sentence of 75 months and ordered Brewer to pay $472.50 in court costs and a $50 fine pursuant to RCW 46.64.055(1).

ANALYSIS

Brewer raises five issues in this appeal. First, he challenges, as hearsay, evidence that his driver's license contains a restriction requiring him to wear corrective lenses while driving. Second, he argues the court erred in admitting demonstrative "time and distance analysis" evidence, contending the reconstruction was substantially dissimilar from the accident. Third, he maintains

- 4 -

the State failed to prove he acted with disregard for the safety of others, an element of the crime of vehicular homicide. Fourth, he maintains the trial court improperly relied on Brewer's drug addiction, information that was never admitted, acknowledged, or proved when determining his sentence. Finally, he asserts the court erred when it ordered him to pay discretionary legal financial obligations without first engaging in an independent inquiry to determine his ability to pay the discretionary fees. We address each of these arguments in turn.

A. Hearsay Evidence

Brewer argues the trial court erred in admitting evidence of the corrective lens restriction on his driver's license. He contends the Department of Licensing (DOL) requirement that he wear corrective lenses when driving, as indicated on his driver's license, renders the license inadmissible as a public record under RCW 5.44.040 because the restriction is not factual, but involves the exercise of judgment or discretion.

We review a trial court's interpretation of an evidentiary rule de novo as a question of law and review the decision to admit evidence for an abuse of discretion. State v. Gunderson, 181 Wn.2d 916, 921-22, 337 P.3d 1090 (2014). An abuse of discretion occurs when a trial court's decision is manifestly unreasonable or based on untenable grounds or reasons, such as a misconstruction of a rule. Id. at 922.

"Hearsay" is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." ER 801(c). Hearsay is inadmissible unless an exception applies. ER 802. One such exception is set out in former RCW 5.44.040 (1991).

State v. Monson, 113 Wn.2d 833, 837, 784 P.2d 485 (1989). This public records statute provides:[3]

> Copies of all records and documents on record or on file in the offices of the various departments of the United States and of this state . . .when duly certified by the respective officers having by the law of custody thereof . . . shall be admitted in evidence in the court of this state.

Our Supreme Court has held that not every public record is automatically admissible:

> In order to be admissible, a report or document prepared by a public official must contain facts and not conclusions involving the exercise of judgment or discretion or the expression of opinion. The subject matter must relate to facts which are of a public nature, it must be retained for the benefit of the public and there must be express statutory authority to compile the report.

Id. at 839 (quoting Steel v. Johnson, 9 Wn.2d 347, 358, 115 P.2d 145 (1941)).

This court has previously held that a certified copy of a defendant's driver's license is admissible as a public record because it is "prepared by a public official and contains facts of a public nature" and "does not contain conclusions involving the exercise of judgment or discretion or the expression of opinion." State v. Bajardi, 3 Wn. App. 2d 726, 731-32, 418 P.3d 164 (2018). Brewer maintains Bajardi is distinguishable because the defendant there challenged the admissibility of a photograph on her driver's license, offered to establish the defendant's identity, and did not challenge a government-imposed restriction on driving privileges.

---

[3] RCW 5.44.040 was amended in 2019 to extend the exception to documents on record with any federally recognized Indian tribe. LAWS OF 2019, ch. 39, § 2. It also changed the verb phrase from "shall be admitted" to "must be admitted." Id. These changes do not affect the analysis here.

Although we agree this case is different than the issue presented in Bajardi, we nevertheless conclude that a DOL license restriction falls within the scope of RCW 5.44.040 and is admissible because the information meets the Monson test. The restriction is factual in nature, is maintained for the benefit of the public, and is imposed pursuant to DOL's express statutory authority.

First, the DOL has express statutory authority to set driving privilege restrictions. Under RCW 46.01.040(12), the DOL has the authority to regulate the issuance of driver's licenses under chapter 46.20 RCW. Anyone applying for a new or renewed license "must successfully pass a driver licensing examination to qualify for a driver's license." RCW 46.20.120. The director of the DOL is authorized to prescribe the content of the licensing examination, which "shall include . . . a test of the applicant's eyesight and ability to see, understand, and follow highway signs regulating, warning, and directing traffic." RCW 46.20.130(1)(a) (emphasis added); WAC 308-104-010(1). If the department has reason to believe that a person has a physical condition that may impact their ability to safely drive a motor vehicle, "the department may . . . issue a restricted driver's license to the person." RCW 46.20.041(2)(c). WAC 308-104-010 details the vision standards required for an applicant to obtain a license. To obtain a license, an applicant must demonstrate visual acuity no worse than 20/40 Snellen[4] for both eyes, either corrected or uncorrected. The DOL thus has the authority to

---

[4] "The first number in the familiar 'Snellen score' for visual acuity refers to the distance between the viewer and the visual target, typically 20 feet. The second number corresponds to the distance at which a person with normal eyesight could distinguish letters of the size that the viewer can distinguish at 20 feet." Fey v. State, 174 Wn. App. 435, 442 n.2, 300 P.3d 435 (2013).

impose a corrective lens restriction on any driver whose visual acuity does not meet this test requirement uncorrected.

Second, the DOL maintains information regarding a driver's need for corrective lenses for the benefit of the public. Under RCW 46.20.041(2)(c)(iii), DOL restrictions are permissible when "determined by the department to be appropriate to assure the licensee's safe operation of a motor vehicle." Operating a motor vehicle in violation of restrictions imposed in a restricted license constitutes a traffic violation. RCW 46.20.041(5). See also WAC 308-104-160(52) (violating any license restriction defined by RCW 46.20.041 constitutes a moving violation).

Finally, a license restriction relating to a driver's visual acuity is a fact "of a public nature." Although the Federal Driver's Privacy Protection Act, of 1994, 18 U.S.C. § 2721(a) prohibits a state department of motor vehicles from publicly disclosing "personal information," defined in 18 U.S.C. § 2725(3) to include medical or disability information, a disclosure is authorized by law enforcement in carrying out its functions, or "in connection with matters of motor vehicle or driver safety or theft." 18 U.S.C. § 2721(b)(1), (2). The public has an interest in having such driving restriction information available when driver safety is at issue. Here, the police asked Brewer about the restriction on his driver's license because he was involved in a fatal driving accident and as a part of an investigation into Brewer's criminal culpability for the death. Brewer's license restriction is, in this context, a fact of "a public nature."

Brewer contends the corrective lens restriction merely reflects the opinion of an unidentified DOL employee who has the discretion to impose the restriction

when they, in their opinion, believe the driver's visual acuity does not meet state standards. He argues this fact renders the driver's license inadmissible. To support this contention, Brewer analogizes his case to Brundridge v. Fluor Fed. Servs., Inc., 164 Wn.2d 432, 191 P.3d 879 (2008). We do not find this argument persuasive.

In Brundridge, a group of industrial pipe fitters filed a complaint against their employer with the United States Department of Labor Occupational Safety and Health Administration (OSHA). Id. at 438. In a subsequent lawsuit, the trial court admitted a redacted version of the report OSHA had generated as part of their investigation. Id. at 449. On appeal, our Supreme Court held that the trial court erred in admitting the report. Id. at 452. While the investigator's conclusions had been redacted, the court reasoned the "facts" left in the report "contained a residue of 'judgment' or 'opinion' because where individuals disagreed on the facts, the investigator necessarily chose whose version of a particular 'fact' to accept." Id. at 451.

This case is not analogous. Brundridge involved a traditional application of discretion, where an official generating an investigative report had to weigh and choose the information that official included. This case, by contrast, involves a test that is mechanical in nature. See State v. Zektzer, 13 Wn. App. 24, 30, 533 P.2d 399 (1975) (concluding "[v]isual acuity is tested mechanically.") There is no evidence that the results of the vision exam are the result of any "discretionary" determination of a DOL employee. If the test is performed properly, the results should be the same regardless of who administers it. Thus, the corrective lens

- 9 -

restriction is more akin to a statement of fact than the expression of opinion. The presence of a restriction on a driver's license indicates only that the holder of the license has a visual acuity of less than 20/40 Snellen uncorrected.

The DOL requirement that Brewer wear corrective lenses when driving, as indicated on his driver's license, does not involve an exercise of judgment or discretion and evidence of the restriction on Brewer's driver's license was admissible as a public record under RCW 5.44.040.[5]

B. Demonstrative Evidence

Brewer next argues the trial court abused its discretion in admitting the State's "time and distance" analysis because substantial differences existed between the actual accident and the accident reconstruction. We see no abuse of discretion here.

"The use of demonstrative evidence is encouraged when it accurately illustrates facts sought to be proved." State v. Finch, 137 Wn.2d 792, 816, 975 P.2d 967 (1999). Demonstrative evidence is permitted "if the experiment was conducted under substantially similar conditions as the event at issue." Id. (citing Jenkins v. Snohomish County Pub. Util. Dist. No. 1, 105 Wn.2d 99, 107, 713 P.2d

---

[5] Brewer also argues that, even if the driver's license itself is admissible under RCW 5.44.040, the restriction might be based on the conclusion of a third-party health care provider and thus may be double hearsay. App. Br. at 32. However, a defendant may not remain silent as to a claimed evidentiary error during trial and then later, for the first time on appeal, urge objections not raised below. State v. Guloy, 104 Wn.2d 412, 421, 705 P.2d 1182 (1985). Brewer did not claim below that the corrective lens restriction was based on hearsay statements made to the DOL by a third party, nor did he cite to ER 805 or suggest the contents of the driver's license contained double hearsay. An objection to the admission of evidence based on one evidentiary rule is insufficient to preserve appellate review under a different evidentiary rule. State v. Kendrick, 47 Wn. App. 620, 634, 736 P.2d 1079 (1987); State v. Jordan, 39 Wn. App. 530, 539-40, 694 P.2d 47 (1985). Brewer failed to preserve this issue for appeal.

79 (1986)). Additionally, the evidence sought to be admitted must be relevant. Finch, 137 Wn.2d at 816. Courts should refuse to admit such evidence if it is likely to confuse the jury, raises collateral issues, or is more prejudicial than probative. Jenkins, 105 Wn.2d at 107.

The trial court has discretion to determine whether the similarity is sufficient and, thus, whether the demonstrative evidence is admissible. Id. If the evidence is admitted, any dissimilarity goes to the weight of the evidence. Id. We review the trial court's evidentiary ruling for abuse of discretion and will only disturb the ruling if it is manifestly unreasonable or based on untenable grounds. In re Pers. Restraint of Duncan, 167 Wn.2d 398, 402, 219 P.3d 666 (2009). A ruling is manifestly unreasonable if it "'adopts a view that no reasonable person would take.'" Id. (quoting Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 132 P.3d 115 (2006)).

At trial, Detective Thomas Bacon, a member of the Seattle Police Department Traffic Collision Investigation Squad, testified that he was assigned to investigate, analyze and form conclusions as to how the collision occurred. He examined the scene of the collision, the jersey barriers, the physical evidence from the scene, and Brewer's truck. He took photographs and generated a 3-D map of the scene. He concluded from his investigation that Brewer came into contact with the cyclist at the right front corner of the F-350 truck.

The State introduced demonstrative evidence of a "time and distance experiment" Detective Bacon conducted to show the relative distance between Brewer's truck and Blaylock's bicycle as they both travelled southbound on First Avenue. Detective Bacon testified that this experiment assumed the truck was

traveling twenty-five miles per hour and the bicyclist was traveling between eight and twelve miles per hour. The detective used these assumptions to calculate each parties' location at various points, working back in time from the point of impact. At each time interval, the detective took photographs from the calculated position of Brewer's truck as compared to the calculated position of a stand-in bicyclist. Detective Bacon took the photographs from the height of the midpoint of the windshield of Brewer's truck, where he estimated the driver's head would have been. Detective Bacon testified his experiment was not an exact replication of what Brewer would have seen on the day of the accident. But based on his assessment of the respective locations of the truck and the bicycle, Detective Bacon concluded Blaylock would have been in front of Brewer and visible for at least twenty-nine seconds leading up to impact.

From the evidence Detective Bacon collected and the time and distance analysis he performed, he opined that "whatever was going on inside of that truck, that driver was not paying attention to what he was doing. [There] was some form of extreme distraction that resulted in this type of driving behavior."

Brewer objected to Detective Bacon's accident reconstruction testimony and photographs, arguing the reconstruction was substantially different than the scene of the accident. In overruling the objection, the trial court compared the photographs Detective Bacon took at the scene on the day of the collision to the photographs taken during the reconstruction and found them to be not "terribly different," and certainly not different enough to be excluded as misleading. It concluded a jury instruction could cure the fact that the reconstruction occurred in

the morning versus the afternoon, when the accident occurred, and the jury would be instructed it was free to accept or reject any expert opinion.

Brewer reiterates his challenge to the admissibility of Detective Bacon's time and distance analysis on appeal.[6] He contends that Detective Bacon's decision to take photos at the height of the midpoint of the driver's window, rather than from inside a comparable truck, did not account for Brewer's actual eye height or any blind spots caused by his front pillar. He also argues that because Detective Bacon took photos during the reconstruction in the morning, rather than late afternoon at the same time as the collision, these photos depicted different lighting conditions. These differences, he maintains, rendered the evidence "completely untethered" from what Brewer would have actually perceived that day.

Brewer relies on State v. Hunter, 152 Wn. App. 30, 216 P.3d 421 (2009), to support the contention that these differences were so significant that the evidence "fail[ed] to meet its purpose." In Hunter, the key issue was whether the defendant, on trial for murder, intended to shoot the victim or whether the gun in his hands went off accidentally. Id. at 33. At trial, the State introduced a demonstrative trigger pull measuring device developed by a former Washington State Crime Lab employee which he claimed demonstrated the feel of pulling the trigger on Hunter's gun. Id. at 34. The record revealed that there were substantial differences

---

[6] Brewer also contends the demonstrative evidence was "based on unfounded assumptions." For this he relies on State v. Hultenschmidt, 125 Wn. App. 259, 102 P.3d 192 (2004). In that case, we upheld a trial court's decision to exclude a defendant's demonstrative evidence because the evidence admittedly depicted events that never occurred. Hultenschmidt is thus not analogous. Moreover, Brewer did not argue below that Detective Bacon's assumptions were so speculative as to warrant the exclusion of the demonstrative evidence. He moved to exclude the evidence solely because the experiment was not conducted under similar conditions. He has not preserved this issue for appeal.

between this measuring device and Hunter's weapon, including the physical dimensions of the reach, the width of the trigger, and the way in which the trigger moved, all of which impacted "perceived trigger pull." Id. at 41-42. The trial court admitted the device as evidence and allowed each juror to step down and pull the trigger measuring device one by one. Id. at 36, 42.

On appeal, this court held the trial court abused its discretion in admitting the evidence because the device was not substantially similar to the firearm actually used in the shooting. Id. at 42. The court explained the "trigger pull device gave the jurors an improper understanding of the amount of pressure needed to pull the trigger on Hunter's firearm, undermining Hunter's theory that he accidentally pulled the trigger." Id.

The State in turn relies on Finch to argue that any dissimilarities between conditions on the day of the accident and on the day Detective Bacon conducted his analysis could be adequately addressed through cross examination. In that case, Finch was convicted of murder after he fired a gun from inside a residence, killing a sheriff's deputy standing outside. Finch, 137 Wn.2d at 803. To prove Finch's actions were premeditated and intentional, officers conducted an experiment to determine how visible the deputy would have been from the window through which Finch had fired his gun. Id. at 804. Investigators placed officers in the same position they were standing at the scene on the night of the shooting and attempted to recreate the same lighting conditions. Id. They then used a video camera to record what could be seen from the bedroom window. Id. The trial court admitted the evidence and ruled that any differences in the conditions portrayed

and those on the night of the crime went to the weight of the evidence and could be addressed through cross examination. Id. at 815.

The Supreme Court affirmed, holding that the demonstrative evidence was created in conditions substantially similar to those on the night in question and that Finch had been able to address any differences during questioning. Id. at 818. It further concluded that, because the video did not purport to be a reenactment of the event, the probative value of the evidence was not outweighed by prejudice to the defendant. Id.

This case is more analogous to Finch than to Hunter. First, the differences on which Brewer relies–the height of the camera, the time of day, and the location from which photographs were taken–are similar to the differences rejected by the Supreme Court in Finch as insufficient to exclude the demonstrative evidence. Detective Bacon explained all of the differences to the jury and they were easily ascertainable by the jury who had photos and videos of the day of the accident with which to compare the demonstrative evidence. Second, unlike in Hunter, the jurors did not become participants in the demonstration and the State did not ask jurors to base their decision on how they felt when engaging in the same conduct as the defendant. Because perception of the pressure needed to pull a trigger is so variable depending on the person actually pulling the trigger, the jurors' perceptions of their own experience would not have replicated Hunter's own experience.

Here, as in Finch, the photos and testimony regarding the demonstration were intended to help the jury visualize what Brewer, not the jurors, could have

- 15 -

seen through his truck window and to understand the relative positions of the truck and the bicycle as they approached the point of impact. Detective Bacon clearly testified that the reconstruction did not purport to reenact the events of the accident. He explained to the jury that he had to make certain assumptions in estimating the relative positions and speeds of the truck and bicycle at any given point in time. Jurors could ascertain some differences between the scene on the day of the accident and the day of the reconstruction with their own eyes. The court admitted numerous photos of the scene taken the day of the accident, as well as a video taken only moments after the accident occurred. During questioning, Detective Bacon described differences in the scene between the day of the homicide and the day of the experiment, including the fact that the jersey barriers had been removed and lighting conditions and shadows were different. Moreover, defense counsel elicited testimony from the photographer, Christopher Mobley, that he had used different exposures and lighting settings for the photographs, which could have affected how light or dark the images were. The circumstances surrounding this demonstrative evidence make it more analogous to the Finch case than to Hunter.

We therefore conclude the trial court did not abuse its discretion in permitting the State to present this demonstrative evidence.

C. Sufficiency of the Evidence

Brewer contends there was insufficient evidence to support his conviction for vehicular homicide. We reject his sufficiency challenge.

Due process of law requires that the State prove every element of a charged crime beyond a reasonable doubt in order to obtain a criminal conviction. State v. O'Hara, 167 Wn.2d 91, 105, 217 P.3d 756 (2009). Because the sufficiency of the evidence is a question of constitutional law, we review this issue de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

To evaluate whether sufficient evidence supports a conviction, this court views the evidence in the light most favorable to the State to determine if "any rational trier of fact could have found the essential elements" of the charged crime beyond a reasonable doubt. State v. Green, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980). A defendant's claim of insufficiency "admits the truth of the State's evidence and all inferences that reasonably can be drawn" from it. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). We consider circumstantial and direct evidence equally reliable. State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). We also defer to the jury's evaluation of witness credibility, resolution of testimony in conflict, and weight and persuasiveness of the evidence. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

Under RCW 46.61.520:

(1) When the death of any person ensues within three years as a proximate result of injury proximately caused by the driving of any vehicle by any person, the driver is guilty of vehicular homicide if the driver was operating a motor vehicle:

(a) While under the influence of intoxicating liquor or any drug . . . or
(b) In a reckless manner; or
(c) With disregard for the safety of others.

The State charged Brewer under subparagraph (1)(c), alleging he operated his truck with disregard for the safety of others. Brewer challenges the sufficiency of evidence demonstrating this element of the charged crime.

The Washington Supreme Court defines "disregard for the safety of others" as "an aggravated kind of negligence or carelessness, falling short of recklessness" but with "a greater and more marked dereliction than ordinary negligence." State v. Eike, 72 Wn.2d 760, 765–66, 435 P.2d 680 (1967); accord State v. Jacobsen, 78 Wn.2d 491, 498, 477 P.2d 1 (1970). Some evidence of a defendant's conscious disregard of a danger to others is necessary to support a charge of vehicular homicide. State v. Lopez, 93 Wn. App. 619, 623, 970 P.2d 765 (1999). To "disregard" means to "treat without fitting respect or attention," or "to give no thought" to or "to pay no attention to." WEBSTER'S THIRD NEW INT'L DICTIONARY 655 (2002).

Brewer argues that, absent some showing by the State of driving under the influence or driving at an excessive speed, a jury could not conclude Brewer consciously disregarded the safety of others. While Washington courts have affirmed vehicular homicide convictions based on behaviors such as driving in the wrong lane, driving erratically while intoxicated or at an excessive speed, and

failing to heed weather conditions,[7] proof of intoxication or recklessness,[8] elements of the crime if charged under RCW 46.61.520(1)(a) or (b), is not required for a charge under RCW 46.61.520(1)(c). The fact that Brewer's driving could have been worse has no bearing on whether sufficient evidence supports the jury's verdict.

Brewer relies on <u>Lopez</u> to support his argument that ordinary negligence is insufficient to support his conviction. While Brewer's statement of the law is correct, <u>Lopez</u> is factually distinct from this case. In that case, the trial court dismissed a charge of vehicular homicide filed against a 14 year-old because the only evidence the State alleged to support the charge was Lopez's status as an unlicensed driver. <u>Lopez</u>, 93 Wn. App. at 622. This court affirmed because there was "no evidence that Ms. Lopez actually was an inexperienced driver or that she participated in speeding, horseplay or driving under the influence of intoxicants. . . . In short, a minor's status as an unlicensed driver is not enough to establish beyond reasonable doubt a disregard for the safety of others." <u>Id. at 623.</u>

---

[7] <u>See</u> <u>Eike</u>, 72 Wn.2d at 766 (upholding conviction where defendant was driving at 45 to 50 miles per hour on a dark, wet highway and crossed the center line to path of oncoming car); <u>State v. McNeal,</u> 98 Wn. App. 585, 593, 991 P.2d 649 (1999), <u>aff'd</u>, 145 Wn.2d 352, 37 P.3d 352 (2002) (explaining that "driving on the wrong side of the road . . . is itself sufficient evidence that at the time of the accident, he was acting with 'disregard for the safety of others.'"); <u>State v. Miller,</u> 60 Wn. App. 767, 807 P.2d 893 (1991) (upholding a conviction where defendant was intoxicated and driving on the wrong side of the road with a headlight out); <u>State v. Knowles</u>, 46 Wn. App. 426, 430-31, 730 P.2d 738 (1986) (upholding conviction of defendant who took a blind curve at 22 miles per hour over the posted speed limit, crossed the center line, and struck an oncoming car); <u>State v. Sanchez</u>, 42 Wn. App. 225, 233, 711 P.2d 1029 (1987) (finding sufficient evidence where Sanchez was driving late at night on icy roads, travelling "faster than the road conditions warranted" and continued to accelerate up a hill despite his car "fishtailing").

[8] RCW 9A.08.010(c) defines "recklessness" as knowing of and disregarding "a substantial risk that a wrongful act may occur" and the disregard for this substantial risk is a "gross deviation from conduct that a reasonable person would exercise in the same situation."

The jury was instructed here that "[o]rdinary negligence in operating a motor vehicle does not render a person guilty of vehicular homicide." Unlike Lopez, the State presented evidence that Brewer drove in a manner that substantially exceeded ordinary negligence. Brewer was so distracted that he failed to notice traffic signals, drove over the fog line, drove across a three-foot-wide shoulder, and drove his right front and rear wheels some 15 inches up a concrete jersey barrier.

The evidence further demonstrates that Blaylock should have been visible to Brewer. The accident occurred in mid-afternoon, shortly after 4 p.m. on a clear and sunny day. Blaylock was brightly clad in a yellow jersey and was in front of and traveling in the same direction as Brewer. Detective Bacon opined that Blaylock would have been in front of Brewer and visible for at least 29 seconds leading up to impact. He further testified that, during this 29-second period, he could not identify anything that should have obstructed Brewer's view of Blaylock. Likewise, none of the witnesses indicated that there was decreased visibility or any reason Blaylock would have been difficult to spot. And Brewer admitted to the officers that, despite needing corrective lenses, he chose not to wear his prescription glasses when he was driving during the day.

Finally, taken in the light most favorable to the State, the evidence suggests Brewer was drowsy or sleep-deprived at the time of the accident. Brewer told officers that he had been out the night before celebrating his birthday at the Tulalip Casino. He stated he had returned home and went to sleep around 3:30 a.m. But location data from his cell phone records showed he had stayed out all night long,

did not return home until about 11 a.m. the day of the accident, and he remained at home for only a couple of hours before leaving again.

A reasonable jury could conclude from this evidence that Brewer was driving with aggravated negligence or carelessness, and paying no attention to his surroundings. This evidence was sufficient to demonstrate that Brewer acted with disregard for the safety of others and to support his conviction for vehicular homicide.

D. Sentencing

Brewer contends the trial court erred in imposing a high-end sentence by improperly relying on facts that he did not admit or acknowledge as true or facts the State failed to prove. Ordinarily, a sentence within the standard range may not be appealed. RCW 9.94A.585(1). But an appellant may challenge a sentence by demonstrating the court failed to follow a specific procedure required by the Sentencing Reform Act (SRA). State v. Mail, 121 Wn.2d 707, 712, 854 P.2d 1042 (1993). Under the real facts doctrine, the sentencing court "may rely on no more information than is admitted by the plea agreement, or admitted, acknowledged, or proved in a trial or at the time of sentencing." RCW 9.94A.530(2).

First, Brewer argues the court relied on the State's allegations that Brewer fled the scene of the accident, a charge the State failed to prove at trial. The record does not support this contention. During the sentencing hearing, the court pointed out that the prosecutor and victim's family requested a high-end sentence because Brewer had not stopped immediately at the scene of the accident. But there is no

evidence that the court accepted these statements a true or relied on them in imposing the sentence.

Second, Brewer contends the court improperly relied on speculation that Brewer drove under the influence of drugs, contrary to the testimony at trial. The record does not support this argument either. Brewer affirmatively represented in his sentencing memo that he had "struggled with opiate addiction–which led to criminal convictions and instability." His counsel told the court at the sentencing hearing that Brewer was "someone who has struggled with addiction." The State pointed out that Brewer was eligible for a Drug Offender Sentencing Alterative (DOSA), but it opposed such a sentence. The court acknowledged "I would be remiss . . . if I didn't mention the ability for a DOSA." The court then discussed family experiences with addiction but prefaced its comments by noting "I don't know what was going on in your system. And it may have nothing to do with this, whatsoever." The court recognized that "as I understand from the investigating detective who testified there was no indication that drugs played a role in this unnecessary death." Brewer did not object to any of these comments at sentencing.

The record clearly establishes that the most important factor influencing the court's sentencing decision was Brewer's 2008 conviction for a hit-and-run fatality. The court stated "this is not a low end sentence because this isn't your first time. It's your second death." Brewer did not dispute these facts. The court went on to say "I have a duty to protect the community for as long as possible. So that there can never be a third or any other type of accident." We therefore reject his

contention that the trial court violated the real facts doctrine in imposing a high-end sentence.

E. Legal Financial Obligations

Finally, Brewer argues the trial court erred when it found him to be not indigent and ordered him to pay $472.50 in court costs under RCW 10.01.160 and a $50 fine under RCW 46.64.055(1) without first inquiring into his ability to pay. We agree and remand for the sentencing court to inquire into his indigency status before imposing discretionary LFOs.

We review de novo whether the trial court conducted an adequate inquiry into the defendant's ability to pay. State v. Ramirez, 191 Wn.2d 732, 740, 426 P.3d 714 (2018).

Under RCW 10.01.160(3), the sentencing court must "make an individualized inquiry into the defendant's current and future ability to pay before the court imposes LFOs." State v. Blazina, 182 Wn.2d 827, 839, 344 P.3d 680 (2015). When conducting this inquiry, the court should consider the mandatory factors established by Blazina, including the defendant's incarceration and other debts, or whether that defendant meets the standard for indigency under GR 34. Ramirez, 191 Wn.2d at 750. "Trial courts must also consider other 'important factors' relating to a defendant's financial circumstances, including employment history, income, assets and other financial resources, monthly living expenses, and other debts." Id.

In Blazina, the Washington State Supreme court considered two consolidated cases: State v. Blazina and State v. Paige-Colter. Blazina, 182

Wn.2d at 830-31. In each of those cases, neither sentencing court considered the defendant's ability to pay before imposing the LFOs. Id. at 831-32. Each defendant's judgment and sentence included boilerplate language stating the court had considered their ability to pay the imposed legal fees. Id. The Supreme Court remanded the cases for new sentencing hearings and explained that the trial court "must do more than sign a judgment and sentence with boilerplate language stating that it engaged in the required inquiry." Id. at 838-39.

There is no evidence here that the trial court considered Brewer's ability to pay discretionary LFOs. At sentencing, the court merely said "[y]ou will be responsible for court costs" and the "$50 Title 46 fee." Brewer's judgment and sentence contains boilerplate language saying the court "considered the defendant's present and likely future financial resources" and concluded "that the defendant has the present or likely future ability to pay the financial obligations imposed." But the record demonstrates no discussion of Brewer's employment history, income, debt or other financial resources or any discussion of his ability to pay.

The State contends that the court knew Brewer had retained private counsel to represent him and thus was aware Brewer was not indigent. It argues no inquiry was needed under these circumstances. But our Supreme Court has been clear: "RCW 10.01.160(3) requires the record to reflect that the sentencing judge make an individualized inquiry" into the defendant's ability to pay. Id. at 839. The court cannot assume a defendant can pay without evaluating the mandatory Blazina factors. "If the trial court fails to conduct an individualized inquiry into the

defendant's financial circumstances, as RCW 10.01.160(3) requires, and nonetheless imposes discretionary LFOs on the defendant, the trial court has per se abused its discretionary power." Ramirez, 191 Wn.2d at 741.

In addition to the LFO determination, the sentencing court should also evaluate what effect, if any, the Supreme Court's decision in State v. Blake has on Brewer's offender score and what effect, if any, a modified offender score will have on Brewer's standard sentencing range. In Blake, the Supreme Court held Washington's strict liability drug possession statute violated the state and federal due process clauses because it criminalized unintentional, unknowing possession of controlled substances. The trial court found Brewer's offender score to be "6" based on, in part, at least three prior drug possession convictions.

We affirm Brewer's conviction but remand for the sentencing court to make an individualized inquiry into Brewer's ability to pay discretionary LFOs and to determine what effect, if any, the Supreme Court's decision in Blake has in this case.

Andrus, A.C.J.

WE CONCUR:

Appelwick, J.

- 25 -